512 So.2d 356 (1987)
Bobby G. SCOTT, et ux.
v.
BANK OF COUSHATTA.
No. 87-C-0597.
Supreme Court of Louisiana.
September 9, 1987.
Dissenting Opinion September 11, 1987.
Rehearing Denied October 29, 1987.
*357 William R. Jones, Coushatta, for applicants.
James Bethard, Bethard & Davis, Coushatta, for respondent.
CALOGERO, Justice.
Bobby Scott and his wife, Sarah Giddings Scott, sought a writ of review from an adverse decision rendered by the court of appeal,[1] which held Bobby Scott liable on a 1980 promissory note in the sum of $1,716.75, plus 14.45% interest and attorney fees. The judgment of the court of appeal also recognized and ordered enforced, to the extent of the judgment, a mortgage on the Scotts' property.
We granted the applicants' writ[2] and now reverse the judgment of the court of appeal. We determine that the 1980 promissory note was extinguished by the negotiation of a 1981 promissory note, the latter being neither signed by, nor otherwise enforceable against, the relators. Accordingly, we will also order cancelled the mortgage securing the indebtedness. Pursuant to recognized principles of Louisiana tort law, we affirm the trial court award of $1,000.00 in damages to the Scotts. However, because the Louisiana Unfair Trade Practices and Consumer Protection Law does not apply to the Bank of Coushatta given the facts before us, we vacate the trial court's award of attorney fees.
On August 4, 1980, Sarah Scott helped arrange the purchase of an automobile by her son, Tony Scott. The car was financed through the Bank of Coushatta, Sarah's employer at the time. In order to assist Tony in the purchase, Mrs. Scott made the down payment on the car with the proceeds of a $1,716.75 promissory note. This side note, dated August 4, 1980 (identified at *358 trial as P-3), bore the purported signature of Bobby Scott. Sarah Scott had admittedly signed her husband's name to that note, but with his permission. The debt was secured by a pledge of a collateral mortgage note on property owned by Bobby and Sarah Scott in Red River Parish. The side note, P-3, provided for an annual percentage rate of 14.45%, and was due on August 4, 1981.[3]
Approximately one year later, Tony, who had in the interim left college and married, decided to purchase a truck, replacing the automobile. His parents, who were opposed to this second purchase, refused to provide Tony with any further help. The Scotts also insisted that Tony pay off P-3, which by then was delinquent for about two weeks.
On August 18, 1981, Tony met with the Bank's president, G.E. Tisdale, and arranged financing of the truck.[4] On that date, a promissory note (identified at trial as P-8) in the amount of $1,983.03 was executed.[5] The note bore the purported signatures of both Tony Scott and his father, Bobby Scott.
The circumstances surrounding the appearance of Bobby Scott's purported signature on P-8 give rise to the issues now before this court. Tony Scott testified that he signed his father's name to P-8 without his father's knowledge or permission. Tony contended that he was told by Mr. Tisdale to sign his father's name to the document. Tisdale, while not remembering any of the details of this transaction, denied that he told Tony to sign his father's name to the document.
A cursory viewing of P-8 gives every indication that both signatures were executed by the same person. Additionally, the Bank at the time had on file a signature card of Bobby Scott. At trial Tisdale compared Bobby Scott's signature card with the "Bobby Scott" signature on P-8 and admitted that P-8 was "probably not" executed by Bobby Scott.
In addition to executing P-8 on August 18, 1981, Tony also executed a chattel mortgage note in the amount of $14,653.44 to cover the purchase price of the truck. Only Tony's signature appears on this note. On August 19, 1981, P-3 was marked "paid" by the Bank and mailed to Bobby and Sarah Scott. In addition, a handwritten notation on P-8 indicated that P-8 had paid off P-3.[6]
In August of 1982, the Scotts received a notice from the Bank that they had a note due. Perplexed by the notice, the Scotts visited the Bank, where they were informed of P-8 and of the purported signature of Bobby Scott on that note. Although the Scotts informed Tisdale that Bobby had not signed P-8, and had not authorized anyone else to do so, the Bank refused to cancel the collateral mortgage.[7]
In April, 1985, the Scotts filed suit, demanding cancellation of the mortgage on the Red River property and seeking damages. The Bank originally reconvened against the Scotts for judgment on P-8, together with interest, attorney fees, and recognition of the mortgage. In a supplemental and amended reconventional demand, the Bank, without conceding that Bobby had not signed P-8, averred that if Tony signed his father's name without authority to do so, P-3 had been marked paid in error.
The Bank also third partied Tony Scott. In that third party demand, the Bank argued *359 that if Tony signed his father's name without authority, his doing so constituted fraud which precluded a discharge in bankruptcy, and rendered him liable to the Bank for any damages it might be found to owe the Scotts.
The trial court found that Bobby had not signed P-8 and that Tony, who had, was without authority to have done so. As a result, Bobby could not be held liable on P-8. Furthermore, the trial court specifically held that P-8 had paid off P-3, such that neither Bobby nor Sarah had any further obligation on P-3.
The collateral mortgage was ordered cancelled and the Scotts were awarded $1,000 in damages and $1,000 in attorney fees pursuant to the Unfair Trade Practices and Consumer Protection Law, La.Rev.Stat. Ann. § 51:1401 et seq. (West Supp.1987). Finally, the trial court dismissed the Bank's claim against Tony, holding the claim had been resolved in the bankruptcy proceedings.
The court of appeal affirmed the trial court's finding that Bobby was not liable on P-8 and the trial court's dismissal of the Bank's claim against Tony.[8] However, the appellate court found that P-3 had not been novated by P-8. For reasons discussed below, the court of appeal concluded that P-8 was a renewal of the debt evidenced by P-3. Accordingly, the appellate court reasoned that P-3 was never paid and that the Scotts still owed the obligation evidenced by P-3.
As a result of this holding, the Scotts were found liable on P-3, and the trial court's award to the Scotts of damages and attorney fees was vacated.
At the outset, we take note of the trial court's holding that P-8 "paid off" P-3. That holding contains both factual implications (as it relates to the Bank's intent in negotiating P-8) and legal implications (relating to whether or not a novation occurred). As a finding of fact, the trial court's holding can only be reversed if it is clearly wrong.
The court of appeal, in resurrecting P-3, noted that "[m]ore probably than not" Tisdale was under the "impression" that P-8 was a "renewal" of P-3. The Second Circuit further noted that "[a]lthough Mr. Tisdale testified that P-8 was a `rework' note intended to pay-off P-3, the transaction, when viewed as a whole, indicates that P-8 was actually a renewal of the debt evidenced by P-3." 501 So.2d at 1035-36.
These findings are suspect for two reasons:
(a) The findings serve to reverse the trial court in a situation where it can hardly be said that the trial judge was clearly wrong;
(b) The characterization given to Mr. Tisdale's testimony by the Second Circuit disregards the payment notations on both P-3 and P-8, and Tisdale's clear, and repeated testimony that P-8 was negotiated to "pay-off" P-3.[9]
*360 We find that the trial court's factual finding (that P-8 paid off P-3) is amply supported in the record and falls far short of being "clearly wrong." The Second Circuit's factual conclusion to the contrary must therefore be reversed.
Although not expressly enunciated by the trial court, the clear legal implication of its decision was that P-3 was somehow extinguished by the negotiation of P-8. The Second Circuit, after its review of the record, found that P-3 had not been extinguished by P-8.
A civilian obligation may be extinguished by payment, La.Civ.Code Ann. art. 1854 (West 1987), novation, art. 1879, or remission, art. 1888. The extinction of an obligation may also result from acts of the creditor which, under the factual circumstances in question, evidence intent to release the debtor. Succession of Foerster, 9 So. 17 (La.1891). Defined simply, in the 1984 revisions to our Civil Code, a novation consists of the extinguishment of an existing obligation by the substitution of a new one. La.Civ.Code Ann. art. 1879 (West 1987); Ouachita Nat'l. Bank in Monroe v. Williamson, 338 So.2d 172 (La.App. 2d Cir. 1976). Prior to 1985, a novation was said to be a contract "consisting of two stipulations; one to extinguish an existing obligation, the other to substitute a new one in its place." La.Civ.Code Ann. art. 2185 (West 1952) (repealed 1984).[10]
Normally, a novation takes place in one of three ways: (1) when a debtor contracts a new debt to his creditor, which new debt is substituted for an old one, which is extinguished; (2) when a new debtor is substituted for the old one, who is discharged by the creditor; and (3) when by the effect of a new engagement, a new creditor is substituted for the old one, with regard to whom the debtor is discharged. La.Civ. Code Ann. art. 2189 (West 1952). Planiol notes that every novation presupposes: (1) the existence of a debt to be extinguished; (2) the creation of a new debt; (3) a difference between the two successive obligations; (4) the will to extinguish the first; and (5) the capacity to dispose of the credit. Planiol, Traite Elementaire De Droit Civil 1 § 532 (1959). The extinguishing effect of the novation is comparable to that of the defense of payment. Id. at § 548.
A novation may never be presumed. La.Civ.Code Ann. art. 2190 (West 1952) [current art. 1880]; Cane River Shopping Center v. Monsour, 443 So.2d 602 (La.App. 3rd Cir.), writ denied, 444 So.2d 1213 (La. 1983); Mardis v. Hollanger, 426 So.2d 392 (La.App. 2d Cir.), writ denied, 430 So.2d 93 (La.1983). Accordingly, the burden of proof for establishing a novation is on the person who asserts it. Placid Oil Co. v. Taylor, 325 So.2d 313 (La.App. 3rd Cir. 1975), writ denied, 329 So.2d 455 (La.1976); Crescent Cigarette Vending Corp. v. Toca, 271 So.2d 53 (La.App. 4th Cir.1972).
The most important factor in determining whether a novation has been effected is the intent of the parties. Placid Oil, 325 So.2d at 316; Midlo and Lehmann v. Katz, 195 So.2d 383 (La.App. 4th Cir.1967). Thus, a novation may occur where the intent of the parties, the character of the transaction, the facts and circumstances surrounding the transaction and the terms of the agreement reveal a desire to effect a novation. Cane River, 443 So.2d at 604; Placid Oil, 325 So.2d at 316. "Although novation does not take place as a necessary consequence of a creditor's taking a new note in substitution of one which he returns to the debtor, novation does take place in such a case if the circumstances surrounding the transaction show... that the parties intended to extinguish the existing debt and to substitute a new one in its place." White Co. v. Hammond *361 Stage Lines, 180 La. 962, 158 So. 353, 356 (1934).
An analysis of the facts of this case, in light of the law regarding novation, leads us to the conclusion that the debt evidenced by P-3 was novated by the execution of P-8. The requisites for a novation, as outlined by Planiol, have clearly been met here. There was "a debt to be extinguished," (P-3), and creation of a new debt, (P-8). The successive obligations were distinctly different (in date, amount, signatories and inclusive charges). There was a will to extinguish the debt (i.e., intent to novate) as evidenced by the notations on P-3 and P-8 and the testimony of Tisdale, and there was nothing impairing the Bank's capacity to dispose of the credit, P-3.
Novation occurred and the debt evidenced by P-3 was thereby extinguished. The judgment of the court of appeal to the contrary will therefore be reversed.[11]
In its reconventional demand, the Bank took the alternative position that if novation would otherwise have occurred there was no extinguishment of the obligation evidenced by P-3 because the Bank marked P-3 paid on the erroneous assumption that Bobby Scott had signed P-8. The theory of the bank, therefore, is that its consent to the "novation" was vitiated by error, and Bobby Scott should therefore remain liable on P-3.
Our Civil Code provides that consent to an obligation can be vitiated by error or fraud. La.Civ.Code Ann. art. 1819 (West 1952) [current art. 1948] Error can invalidate a contract if it is related to the principal cause, or motive, for making the agreement. La.Civ.Code Ann. arts. 1823, 1825, 1826 (West 1952) [current art. 1949]
A review of applicable civilian jurisprudence indicates that error on the part of one party may not invalidate the agreement if the cause of the error was the complaining party's inexcusable neglect in discovering the error. A bank's inexcusable neglect precluded it from successfully rescinding a novation in Marsh Investment Corp. v. Langford, 554 F.Supp. 800 (E.D. La. 1982), aff'd in part, vacated in part, 721 F.2d 1011 (5th Cir.1983), dismissed on remand, 620 F.Supp. 880 (1985). In Marsh, the obligations owed to Pontchartrain State Bank arose from Mrs. Eunice Bristow's execution of two promissory notes. When the bank filed suit to collect on these notes, Mrs. Bristow's son, John Langford, agreed with the bank to restructure his, as well as his mother's, debts. The bank agreed to dismiss the suit against Bristow and cancel her promissory notes in exchange for a new note, representing the combined indebtedness of Bristow and Langford, and secured by a collateral mortgage on property owned by Marsh Investment Corporation. The agreement was executed by Langford, and all parties stipulated that the agreement constituted a novation of Bristow's debt.
The trial court originally found Langford had no authority to encumber the Marsh property. That mortgage was therefore cancelled. The bank's extinguishing Bristow's debt had been prompted by Langford's fraud and the bank's corresponding erroneous assumption that they had adequate security for the substitute obligation. The bank thereafter attempted to reinstate Bristow's obligation. Originally, the trial court framed the issue as "whether the original obligation should be reversed if the substituted obligation fails." Marsh, 554 F.Supp. at 808. Finding that the bank had not acted "in good faith" in restructuring the loans, the bank's request for relief was denied. Id.
On remand, the trial court noted that the bank's "gross fault" in failing to apprise itself of pertinent facts precluded a finding in their favor. Analogizing to the Civil Code articles on sales, the federal court *362 held the bank's neglect precluded it from rescinding the novation:
Where the purchaser brings a rescissory action in redhibition based on a defective condition, relief is denied where the defect is one which the buyer might have discovered by simple inspection. La.Civ. Code Ann. art. 2521 (West 1952). In the case of a misrepresentation, relief is denied where the purchaser had every reasonable opportunity to become informed about the facts and has failed to do so.
To establish a right to rescission of a contract based on fraud, the party seeking relief must show a material misrepresentation of fact upon which that party had "a right to rely and actually did rely." Likewise, in a case of nonfraudulent misrepresentation, or "innocent misrepresentation," a contract may be rescinded when there has been justifiable reliance.
The Bank's conduct in this case clearly established that it had no right to rely on Langford's representations of agency and authority, whether made fraudulently or with reckless disregard of their veracity. The Bank recognized that it needed more than Langford's bald assertions of authority to encumber Marsh's property, but it took no steps to verify the documents which purported to give him that authority. As I have previously held, the Bank was not justified in relying on either the corporate resolution or the shareholder consents. Although the shareholder consents were readily available for inspection, the Bank failed to take steps either to see them or to obtain further information about their validity. As to the corporate resolution, a "cursory examination of Marsh's corporate records" would have revealed the falsehood. "Moreover, the Bank could not have justifiably relied on the opinion by Langford's counsel, Mr. Stassi, which was so qualified that it should have waved a sea of red flags indicating that additional investigation was necessary."
* * * * * *
If there was error or fraud in this case it was readily apparent. Bank officials knew that Langford was a poor credit risk, knew that he had no connection with the Marsh corporation other than his asserted agency, and expressly discussed the possibility that Langford was attempting to defraud the Bank. The Bank, schooled in financial dealings and fully assisted by counsel, chose to proceed in ignorance in this matter. Such a conscious course of conduct under the suspicious circumstances of this case may properly be characterized under Louisiana law as gross fault or negligence.
620 F.Supp. at 884-85 (citations omitted).
Louisiana jurisprudence is sprinkled with cases which deny relief to parties who claim an agreement should be invalidated because of unilateral error which is caused, in large part, by the complaining party's inexcusable ignorance, neglect, or want of care.[12] A review of this jurisprudence indicates two prominent factors in the evolution of the contractual negligence defense:
(a) Solemn agreements between contracting parties should not be upset when the error at issue is unilateral, easily detectable, and could have been rectified by a minimal amount of care.
(b) Louisiana courts appear reluctant to vitiate agreements when the complaining party is, either through education or experience, in a position which renders his claim of error particularly difficult to rationalize, accept, or condone.
The contractual negligence defense was acknowledged as early as 1820 in the case of Wikoff v. Townsend, 7 Mart. (o.s.) 451 (La.1820). In that case, the defendants withheld the purchase price of a lot in New Orleans which they had bought from the *363 plaintiff, as they contended they were placed in error as to the extent of property to be purchased by the plaintiff's agent. Although both parties agreed upon the purchase of a two hundred foot lot, the lot apparently did not equate with the boundaries pointed out by the agent. Focusing on the buyer's shortcomings in failing to measure the lot, our predecessors refused to grant rescission:
We do not think that this is an error which vitiates the contract. The defendants understood they were purchasing a space of two hundred feet in front; they knew, or at least must be supposed to have known, what extent that was. If they wanted to satisfy themselves on that score, they might have had it measured; but, if relying on their own judgment they made any mistake, as to the real extent of the two hundred feet, they cannot plead such a mistake as an excuse.
7 Mart. (o.s.) at 452-53.
See also, Watson v. The Planters' Bank of Tennessee, 22 La.Ann. 14 (La.1870); Hebert v. Livingston Parish School Board, 438 So.2d 1141 (La.App. 1st Cir.1983); Wax v. Woods, 209 So.2d 329 (La.App. 4th Cir.), writ denied, 252 La. 467, 211 So.2d 330 (1968).
In addition to the Marsh decision, other Louisiana cases have rejected the defense of unilateral error where the complaining party, through education or experience, had the knowledge or expertise to easily rectify or discover the error complained of. See, e.g., Tiblier v. Family Real Estate Inc., 195 So.2d 432 (La.App. 4th Cir.1967) (dentist); Swearingen v. Maynard, 9 So.2d 272 (La.App. 2d Cir.1942) (businessman).
In the case before us, the Bank contends the novation should be rescinded because of the "error" which resulted in its accepting P-8 with the allegedly unauthorized signature of Bobby Scott. As was the case in Marsh, however, a "sea of red flags" should have been raised to the Bank concerning possible problems with the execution of P-8. Among the deficiencies regarding the execution of P-8 were the following:
(a) The evidence supports, at the least the Bank's allowing the note to be taken out of its offices for endorsement.
(b) The Bank required no witnesses to execution of the note.
(c) Tony Scott made no attempt to disguise the signing of his father's name. The two signatures on P-8 appear to have been signed by the same person.
(d) Tisdale admitted at trial that the signature card of Bobby Scott contained in the Bank's files indicated that P-8 was probably not signed by Bobby Scott.
(e) The bank apparently did not investigate the apparent discrepancy when they made the renewal loan to Tony.
(f) No one at the Bank contacted the elder Scotts about P-8 and the purported signature thereon by Bobby Scott, either before making the loan to Tony or at anytime before August of 1982, even though the Scotts resided in Coushatta, a short distance from the Bank, and Mrs. Scott was a former Bank employee.
In short, these lax banking practices preclude the Bank's now rescinding the novation.

DAMAGES AND ATTORNEY FEES
The trial court awarded the Scotts $1,000 in general damages and $1,000 in attorney fees. In an assignment of error the Scotts also urge that those awards against the Bank should be reinstated.[13] While we agree that the Scotts are entitled to the $1,000 in damages, we determine that they are not entitled to attorney fees.
*364 The trial court's award of attorney fees was made pursuant to the provisions of the Louisiana Unfair Trade Practices and Consumer Protection Law, La.Rev.Stat.Ann. § 51:1401 et seq. (West Supp.1987). However, exempted from the provisions of the act are "[a]ctions or transactions subject to the jurisdiction of ... the state bank commissioner... and any bank chartered by or under the authority of the United States." La.Rev.Stat.Ann. § 51:1406(1). Monitoring and collecting a loan are powers incidental to a state bank's express power to loan money and therefore constitute actions subject to the jurisdiction of the Commissioner of Financial Institutions.[14]State Bank of Commerce v. Demco of La., Inc., 483 So.2d 1119 (La.App. 5th Cir.1986). Accordingly, the trial court's award of attorney fees must be vacated, because the transaction is subject to the jurisdiction of the commissioner and is exempt from the provisions of the Act.
The Scotts' petition does make a claim for general damages under our state's tort or negligence law, based upon the Bank's wrongful failure to cancel the collateral mortgage. La.Civ.Code art. 2315 recognizes that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Article 2315 has been utilized by Louisiana courts to impose tort liability against banks that have violated clear fiduciary duties to their customers. See, e.g., Coburn v. Commercial Nat'l Bank, 453 So.2d 597 (La.App. 2d Cir.1984) (damages awarded against bank which failed to release a mortgage on the plaintiff's home after it gained constructive knowledge that the mortgage in question was void). See also, Demco, 483 So.2d at 1122.
So, too, in this case the trial court found that the bank should have, but did not, release the mortgage on the Scotts' property. The award of $1,000 in damages is supported by the law and the evidence and we cannot say the trial court was clearly wrong in this regard.

DECREE
The judgment of the court of appeal is reversed. The judgment of the trial court is vacated only insofar as it awarded attorney fees to the Scotts. In all other respects, the judgment of the trial court is affirmed.
JUDGMENT OF COURT OF APPEAL REVERSED; JUDGMENT OF DISTRICT COURT REINSTATED IN PART.
MARCUS and LEMMON, JJ., dissent and assign reasons.
DENNIS, J., dissents with reasons.
MARCUS, Justice (dissenting).
Error of the bank induced by Tony's signing his father's name to P-8 should have rescinded the novation regardless of the "lax banking practices" of the bank. Hence, I do not consider that the 1980 promissory note was extinguished. Accordingly, I respectfully dissent.
LEMMON, Justice, dissenting.
Bobby Scott should not be relieved of liability as a co-maker on the 1980 note for $1,716.75 because the bank negligently cancelled that note when Scott's son forged Scott's signature to the 1981 substitute note for $1,983.03, at least in the absence of proof by Scott either that the bank participated in the fraud or that he suffered damages in reliance on that cancellation.[1]
The bank's consent to the novation in 1981 (which cancelled the 1980 note) was obtained by fraud perpetrated by Scott's son. Thus, the bank should be entitled to vitiate the 1981 novation and to reinstate the 1980 note on which Bobby Scott was a co-maker, unless Scott showed that he innocently relied to his detriment on the bank's negligent cancellation of the 1980 note.[2] *365 Scott's failure to establish a sufficient basis for defeating the bank's entitlement to annul the contract of novation on account of fraud in the formation renders him liable for the balance on the 1980 note.
DENNIS, Justice, dissenting.
I respectfully dissent.
Although I agree with most of the majority's statement of legal precepts, I disagree with its articulation and application of a rule which precludes rescission of an obligation based on error or fraud because of a party's slight negligence. The majority's decision breaks with precedents establishing an inexcusable error rule and can only result in requiring bankers to take extreme precautions that will impose unnecessary costs of time, inconvenience and expense on honest, reasonable bank customers.
As the majority correctly recognizes, novation depends upon substitution of a new obligation for an existing one. La.C.C. art. 1879 (1984) (former C.C. art. 2185); 1 Litvinoff, Obligations, § 397 in 6 Louisiana Civil Law Treatise 669 (1969). If the second obligation is set aside for some vice of consent such as error or fraud, the original obligation stands. See La.C.C. art. 1948 (1984) (former art. 1819). Aubry et Rau, Civil Law Treatise § 324(4). I agree with the majority's decision that the second obligation entered into by the Bank, as creditor, and Tony and Bobby, as co-debtors, effected a novation of the previous obligation (exhibit P-3). However, the Bank's consent was clearly conditioned upon the validity of Bobby's signature. This was a primary cause of the second agreement, and the invalidity of such signature should result in the voiding of the obligation. La. C.C. art. 1949 (1984). The Bank of Coushatta was therefore entitled to bring a rescissory action, barring some basis for preclusion.
Under previous Louisiana case law, as well as modern civilian doctrine, in determining whether to grant rescission or, when rescission is granted, whether to allow any recovery to the party not in error, the court may consider whether the error was excusable or inexcusable. Watson v. Planter's Bank of Tennessee, 22 La.Ann. 14, 15 (1870); Boehmer Sales Agency v. Russo, 99 So.2d 475 (La.App.Orl.Cir.1958); 6 Planiol et Ripert, Traite pratique de droit civil francais 227-29; Litvinoff, "`Error' in the Civil Law," in Essays on the Civil Law of Obligations 222, 226-269 (Dainow ed. 1969); Palmer, Contractual Negligence In The Civil LawThe Evolution of a Defense to Actions For Error, 50 Tul.L.Rev. 1 (1975). Under the Civil Code, inexcusable negligence or ignorance is the source of gross fault, which is considered as nearly equal to fraud. La.C.C. art. 3556(13) (1870). The court may also consider whether the other party has changed his position and the importance of such a change. In this context, Louisiana courts have said that in case of doubt as to error in the motive of one of the parties, courts will lean heavily in favor of one seeking to avoid loss and against one seeking to obtain a gain. La.C.C. art. 1952 Comment (d). Dorvin-Huddleston Developments, Inc. v. Connolly, 285 So.2d 359 (La.App. 4th Cir. 1973); reversed on other grounds, 298 So.2d 734 (La.1974); on remand, 320 So.2d 253 (La.App. 4th Cir.1975).
In this case, the Bank was guilty of slight or very slight negligence, if any, in trusting Tony to obtain the signature of his father, Bobby. The Bank had done business with Tony and his father before and had no reason to suspect either of dishonesty. The Bank clearly was not guilty of inexcusable error or gross fault. Neither Bobby nor Tony changed his position or suffered damage because of the Bank's action. The Bank is merely seeking to avoid loss, whereas Bobby is seeking to obtain a gain or a windfall from the Bank's slight excusable error. Accordingly, the Bank should not be barred from rescinding the second obligation because of its error induced by Tony's fraud or error.
In addition to analytical errors, the rule of the majority's opinion places on bankers the unrealistic burden of dealing with every customer as if he were an untrustworthy *366 individual. Such extreme precautions, not customary in ordinary business circles, will increase delay, inconvenience and overhead costs ultimately passed on to honest bank patrons. The previous rule followed by Louisiana courts and modern civilian doctrine, viz., the inexcusable error or gross fault rule, is more practicable and ultimately fairer to the vast majority of banking customers engaging in good faith transactions. See Palmer, supra at 47-49.
NOTES
[1] 501 So.2d 1032 (La.App. 2d Cir.1987).
[2] 504 So.2d 868 (La. 1987).
[3] The remainder of the automobile's purchase price was financed by Tony's execution of a chattel mortgage note in the amount of $10,494.96, with an annual percentage rate of 14.45%. This note was signed by Tony; Sarah affixed Bobby's signature, purportedly with Bobby's approval.
[4] Tisdale had also negotiated P-3 a year before.
[5] The note contained a finance charge and a notation for credit life insurance. Similar charges had not been included in the 1980 note designated P-3. P-8 also carried an annual interest rate percentage of 19%, some 4.55% more than the earlier note.
[6] The specific bank designation is "P/O Loan # XXXXXXXXXX." This loan number coincides with the loan number of P-3.
[7] In late 1982, Tony Scott filed a petition for bankruptcy and was later discharged. The discharge included the debt evidenced by P-8.
[8] The court of appeal noted that the bankruptcy court has exclusive jurisdiction to adjudicate the dischargeability of debts for money obtained through the alleged fraud of the bankrupt debtor. 11 U.S.C. § 523(c). These findings were not contested by the Bank and hence have become final.
[9] In spite of numerous attempts by his attorney to intimate that P-8 was merely a "renewal" of P-3, Tisdale repeatedly testified that P-3 had been "paid" by P-8:

Q. I'm going to show you P-8, and ask you what is typed at the top of P-8?
A. It says 24, identifing the note, and then it says "rework."
Q. And what does rework mean, at the Bank of Coushatta?
A. It's a common language that is used when one note is negotiated to pay off another note, or, in light [sic] fashion.
Q. And this particular note, P-8, is it identified somewhere on that ______ note that is was reworked?
A. Yes, sir, it says that it pays off the previous note.
* * * * * *
Q. Would it have been unusual in this circumstance for you to be the one to tell the bank employees to go ahead and pay the note and send it to the Scotts?
A. No, sir, this would have most likely been done at the note window.
Q. Who would they have gotten their instructions from?
A. Well, they would not have done it had they not been under the impression that the note paying off the previous note was complete.
Q. Would they have gotten their instructions from you? Or from a loan officer?
A. I don't think specifically, Mr. Bethard, because if in their opinion the note is complete when they receive it, and they are instructed as to what to look for when the note is complete, they are authorized to cancel the next note.
Record at 138, 141.
[10] This case arose prior to revision of Titles III and IV of Book III of the Civil Code in 1984 by La.Acts No. 331, which became effective on January 1, 1985. For the remainder of this opinion, citations will be given to the code articles as they existed prior to the 1984 revisions. The new articles will be bracketed as necessary.
[11] We do not quarrel with the jurisprudence which holds that the execution of a new note in renewal of an old one does not novate the original debt. However, the cases cited by the court of appeal are distinguishable on their facts. None of the cases cited contain the compelling facts now before us. P-8 was clearly not a "renewal" of P-3, but rather was a new and distinct obligation, with an additional obligor, which served to extinguish, or pay-off, P-3. The Bank's intent in this regard is clear.
[12] An excellent analysis of the contractual negligence defense in Louisiana has been provided by Vernon V. Palmer in his law review article entitled CONTRACTUAL NEGLIGENCE IN THE CIVIL LAWTHE EVOLUTION OF A DEFENSE TO ACTIONS FOR ERROR, 50 Tul.L. Rev. 1 (1975).
[13] In their writ to this Court, the Scotts did not by assignment of error or otherwise ask that the trial court's damage award be increased. See La.Sup.Ct.R. X § 4(a)(3), and its requirement that writ applications contain the assignment of errors complained of by the applicant. Furthermore, it was the novation issue alone which prompted our grant of writs in this case. Accordingly, we do not address relator's contention in brief that greater damages should have been awarded by the trial court.
[14] Formerly the state bank commissioner.
[1] Perhaps in the latter event Bobby Scott should not be relieved of liability on the note, but instead should be entitled to the amount of reliance damages.
[2] The only suggestion of detriment to Bobby Scott is the inference that his chances of obtaining contributions from the son toward the payment of the debt were possibly better at the time of the novation than at the time of the bank's subsequent demand for payment of the 1981 note.