William S. SMITH, Jr., and Marion R. Smith, Plaintiffs–Appellants,

v.

COOPER/T. SMITH CORP., et al., Defendants–Appellees.

No. 87–3247.

United States Court of Appeals, Fifth Circuit.

June 7, 1988.

Order on Grant of Rehearing En Banc Aug. 1, 1988.

---

**29.** *Id.* § 188(3).

**30.** *Kellum v. Pacific Nat'l Fire Ins. Co.,* 360 S.W. 2d 538, 542 (Tex.Civ.App.—Dallas 1962) (emphasis added).

Stone, Pigman, Walther, Wittman & Hutchinson, Gregory F. Gambel, Karen L. Sonnier, New Orleans, La., William H. Jeffress, J.R. Caldwell, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D.C., for plaintiffs-appellants.

Harry A. Rosenberg, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Armbrecht, Jackson, Demouy, Crowe, Holmes & Reeves, Norman E. Waldrop, Jr., Mobile, Ala., for Cooper/T. Smith Corp.

Gordon, Arata, McCollam & Duplantis, New Orleans, La., John M. McCollam, Ewell E. Eagan, Bernard J. Rothbaum, Jr., James P. Linn, Linn & Helms, Oklahoma City, Okl., for Moffett, Amato and Merrigan.

Harvey C. Koch, Howard Marks, New Orleans, La., for James E. Smith, Sr.

Before VAN GRAAFEILAND,[*] JOHNSON and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Smiths appeal the district court's summary judgment dismissing their securities, RICO and state law claims. Finding that they sufficiently stated a security claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, as well as a RICO

[*] Circuit Judge of the Second Circuit, sitting by designation.

claim under 18 U.S.C. § 1961 *et seq.*, we reverse and remand as to these claims.

## I

This case arises from a series of transactions involving a family business. In 1980, the plaintiffs, William Smith and Marion Smith, together with other members of the Smith family, entered into an agreement for the sale of all stock of the "Smith Companies." Under this agreement, they were to sell their stock to the Cooper/T. Smith Corporation ("CTS") for $40 million. The parties signed an agreement that provided for installment payments over the next several years. Some of these payments were made, but in 1984, CTS approached the Smiths for a modification of the original agreement, claiming that CTS was in financial straits and might be unable to make future payments to the Smiths. CTS requested that the Smiths renegotiate the payment plan and lower the overall amount of money due in order to avoid insolvency of the company. The plaintiffs state that they were unhappy with this turn of events, and demanded a careful examination of CTS's financial status in order to be sure that the continued viability of the company required this modification. The plaintiffs state (and since this is an appeal from a summary judgment, we must assume) that they inquired as to the possible alternative of CTS's selling substantial assets for an influx of the needed cash. The plaintiffs say that CTS told them that they had been trying to sell assets for some time, but that the market would not allow it. Based on these representations and thus believing there was no other alternative if the company was to avoid failure, the Smiths state that they agreed to go along with the modification in June 1984. In July 1984, CTS completed the sale of two derricks, worth $7 million. The Smiths allege that negotiations and preparations for this sale were going on even while CTS represented to them that it was impossible to sell assets at that time. The Smiths learned of the sale in August 1984, and later brought this suit.

## II

The plaintiffs filed suit in July 1985. They sought damages under the Securities

Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b), and Rule 10(b)(5) 17 C.F.R. § 240.-10b–5; the Louisiana Blue Sky Law, La. Rev.Stat.Ann. § 51:701 *et seq.*; RICO, 18 U.S.C. § 1961, *et seq*; the Louisiana Unfair Trade Practices Act, La.Rev.Stat.Ann. § 51:1401 *et seq.* ("UTPA"); and the Louisiana law for intentional or negligent misrepresentations and omissions. In stages, the district court granted the defendants summary judgment, first on the UTPA count, stating that the Louisiana statute "does not apply to securities transactions"; then on the RICO claim, on the ground that the complaint did not sufficiently allege a "pattern of racketeering activity"; and later on the securities claims, because the alleged fraud was not "in connection with" the purchase or sale of securities. The district court retained jurisdiction over the state law claims, and would have proceeded to trial had the plaintiff not agreed to the dismissal with prejudice of these claims in order to take this appeal.

### III

#### A.

■ The district court dismissed the securities claim because it did not think that the fraud alleged here was "in connection with" the purchase or sale of a security, which is a required element of a section 10(b) claim.[1] The district court states that the parties were negotiating a "debt modification agreement," which did not involve securities. The court says that the parties themselves referred to the agreement as a debt modification agreement. The agreement, however, is not entitled "Debt Modification Agreement" as the district court

states but rather is entitled "Modification Agreement." It also includes explicit language stating that it is a modification of the prior stock purchase agreement. Thus it is a misleading oversimplification to label the transaction as a "debt modification agreement." The original stock purchase agreement was clearly a securities purchase, and any fraud in bringing it about would, without doubt, be fraud "in connection with" the purchase or sale of securities. Before that original agreement was fully performed, the parties decided to renegotiate the price that CTS was obligated to pay the Smiths for the stock of the Smith companies. It seems quite clear that the new agreement, dealing expressly with terms and price of a stock transaction as it does, is also a stock purchase agreement, and, it follows, is "in connection with" the purchase or sale of securities. Any fraud in inducing this agreement would therefore also give rise to a section 10(b) and Rule 10(b)(5) claim. *Davis v. Davis*, 526 F.2d 1286 (5th Cir.1976); *see also Ohashi v. Verit Industries*, 536 F.2d 849 (9th Cir), *cert. denied*, 429 U.S. 1004¢G, 97 S.Ct. 538, 50 L.Ed.2d 616¢G (1976). In particular, *Davis* involves a plaintiff who sold his shares in several corporations under a contract that the defendants later attempted to undermine through a "coercive scheme" to force Davis to sell his shares at a price substantially lower than the stated contract price. This court held that a party to such a contract was indeed a "purchaser" or "seller" of securities for purposes of section 10(b) and Rule 10(b)(5). We said:

Even though the alleged scheme did not arise until after the contract to sell had been entered, we agree with the district

---

1. Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange—

....

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b)

Rule 10b–5 states:

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

court that it is still "in connection with the sale." Payment has not yet been made pursuant to the contract and the purpose of the scheme was to reduce the amount of that payment. The alleged scheme sufficiently "touches" the contract to sell plaintiff's securities to be "in connection with" the sale.

526 F.2d at 1290.

This case appears directly on point, and we think the defendants' attempts to distinguish it are unavailing. The defendants emphasize that the 1984 modification agreement took place four years after the original stock purchase agreement. The amount of time seems irrelevant. So does the fact that in this case some of the money had been paid while in *Davis* none had yet been paid. The fact remains that this contract, like the *Davis* contract, was still executory, that is, it had not been carried out to its end before the attempt to modify its terms occurred. Fraud in an attempt to modify a stock purchase agreement midterm is reached by section 10(b) under the facts before us today.

## B.

■■■ The Smiths also argue that the district court erred in finding the alleged fraud was not covered by Louisiana's Unfair Trade Practices Act, La.Rev.Stat.Ann. § 51:1401 *et seq.*. The district court held that UTPA, being a consumer protection statute, did not apply to transactions such as that in this case. The only case directly addressing this issue, *Moore v. A.G. Edwards & Sons, Inc.*, 631 F.Supp. 138 (E.D. La.1986), agreed with the district court's holding here, and so do we. In *Moore*, Judge Feldman held that UTPA was inapplicable to securities transactions because:

> The application of the UTPA to these transactions would produce effects that

were not intended, it seems, by the Louisiana legislature. For example, the director of the Governor's Consumer Protection Division is given the power to investigate and enforce the UTPA. The application of the UTPA to securities claims would provide for unintended overlapping of investigative enforcement powers because the state banking commissioner is also authorized to investigate and enforce laws pertaining to securities under the Blue Sky law.

> An even more bothersome factor to the court is the prospect of subjecting securities claims to treble damages under the UTPA. Securities transactions have long been regulated by the state Blue Sky Law. This Court finds that if the legislature wanted to expose securities violators to the punitive spectre of treble damages, the Blue Sky statute would have and could have clearly so provided. The Court therefore concludes that the UTPA was not meant to apply to securities transactions.... This Court will not assign so loose a meaning to the notion of unfair trade practices so as to divine a result not originally contemplated by the legislature.

*Id.* 631 F.Supp. at 145. We find the reasoning in *Moore* to be convincing.[2] Furthermore, we believe the result is indicated in the provisions of UTPA itself. UTPA excludes from its applications transactions subject to the jurisdiction of the state banking commissioner. La.Rev.Stat.Ann. § 51:1406(1). As is evident from Louisiana Blue Sky Law, La.Rev.Stat.Ann. §§ 51:701 *et seq.*, the commissioner of financial institutions (i.e., the state bank commissioner) has authority to regulate securities transactions.[3] The statute specifically exempts

---

**2.** *See also* cases analyzing a similar Texas statute, the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. § 17.41 *et seq*: *Federal Deposit Ins. Corp. v. Munn*, 804 F.2d 860 (5th Cir.1986) (stock in company and bank loan not "goods" for purposes of the definition of "consumer" under the Texas statute); *Swenson v. Engelstad*, 626 F.2d 421 (5th Cir.1980) (stock certificate transactions not covered by Texas statute); and *Allais v. Donaldson, Lufkin & Jenrette*, 532 F.Supp. 749 (S.D.Tex.1982) (sale of securities not a sale of "goods" under Texas statute).

**3.** As we have earlier held, the facts of this case constitute a security transaction. One provision

of the Louisiana Blue Sky law is particularly similar to section 10(b) and Rule 10(b)(5) of the federal securities laws, by which we have already found this transaction is covered:

> It shall be unlawful for any person in connection with the offer, sale, or purchase of any security, directly or indirectly: ...
> (1) to employ any device, scheme, or artifice to defraud.
> (2) to engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser or seller.

La.Rev.Stat.Ann. § 51:712D. Section 713 gives the commissioner the power to issue an order

securities transactions such as the one at issue here. The district court therefore properly granted summary judgment as to this part of the Smiths' claim.

### C.

■ Finally, the Smiths challenge the district court's holding that their complaint failed to state a "pattern" of racketeering activity sufficient to state a cause of action under RICO. Although the plaintiff alleged numerous uses of the mails and the telephone in furtherance of CTS's allegedly fraudulent scheme (i.e., multiple acts of mail fraud, wire fraud, and securities fraud, indictable under 18 U.S.C. §§ 1341 and 1343 and 15 U.S.C. § 78j(b)), the district court held that these allegations did not establish a "pattern" as required by RICO, 18 U.S.C. § 1962(c). This circuit has held that two related predicate acts are enough to constitute a pattern under RICO. *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir.1985). CTS challenges the wisdom of that opinion and asks us to overturn it. Such a request can only be made to the entire court sitting en banc, not to another panel. *R.A.G.S.* controls this question, and the Smiths' complaint does state allegations sufficient to support a "pattern" of racketeering activity in order to make out a RICO claim.[4]

### IV

We conclude that the district court correctly dismissed the Smiths' claim under UTPA, but find that the Smiths have sufficiently alleged securities claims under section 10(b) and Rule 10(b)(5) and a RICO claim. We therefore reverse the judgment of the district court as to these claims, and remand for further consideration not inconsistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

---

for the protection of investors prohibiting anyone violating section 712 from continuing such violation subject to the right of a hearing. La. Rev.Stat.Ann. § 51:713A.(1). Louisiana case law indicates that the commissioner of financial institutions, referred to in the Louisiana Blue Sky law, is the same as the state bank commissioner referred to in UTPA. *Scott v. Bank of Coushatta,* 512 So.2d 356, 364 (La.1987). Since

---

### ON SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, and SMITH, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the suggestion for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed.

---

these securities law provisions place the transaction in our case under the jurisdiction of the state bank commissioner, UTPA explicitly excludes this transaction from its own reach.

4. Because the district court did not address the issue of whether an "enterprise" existed in satisfaction of RICO's requirements, we do not address it on appeal.