JiWICKER, Judge.
This appeal arises from a suit to rescind a sale of immovable property and alternatively a reduction in the purchase price. Sheryl LeBlanc wife of/and David Delcambre purchased a house from Janell Faul wife of/and Jerome Lorrain. The Delcambres, plaintiffs/appellants, filed an action in redhibition, fraud, and negligent misrepresentation against the Lorrains, defendants/appellees. They also allege mutual error vitiates the contract of sale. The Delcambres alleged the Lorrains knew but did not reveal prior to the sale that the house leaned and that it had flooded three times prior to the sale. They also alleged the house flooded six or seven months after the sale. The Lorrains contend the Delcambres had full knowledge of the problems.
The Lorrains filed third-party demands against the real estate agents and realtors handling the sale. The sellers’ agent and realtor was Nelwyn B. Mclnnis of Property Plus, Inc., d/b/a Prudential Louisiana Properties. The buyers’ agent and realtor was Jamie L. Ragusa of Latter & Blum, Inc. The agents/realtors filed cross-claims against each other. The trial judge rendered judgment in favor of the defendants and third-party defendants. The Delcambres have appealed. The Lorrains have answered the appeal and taken a devolutive appeal. The Lorrains seek to have the judgment amended to cast the plaintiffs for the entire costs rather than having each party bear its own costs. They also seek alternatively an appeal from the dismissal of the third-party demands should plaintiffs succeed in their appeal. We affirm.
We note at the outset that the Lorrains have failed to brief any alleged errors regarding their answer to the appeal. Therefore, pursuant to Uniform Rules— Court of Appeal 2-12.4 we consider argument on these alleged errors regarding the apportionment of costs abandoned. Oubre v. Bank of Charles Trust Co., 499 So.2d 602 (La.App. 5th Cir.1986), writ denied, 503 So.2d 20 (La.1987).
Additionally, since we affirm the judgment of the trial court we pretermit any discussion regarding the Lorrains’ alternative appeal regarding the dismissal of their third party demands.
*837 [20n appeal the Delcambres specify as errors the following: failure to decide all of the legal issues presented; failure to find a red-hibitory defect; misapplication of the law, and error in finding a reduced price had been agreed to by the parties.
FACTS
HOUSE FLOODING
Mrs. Lorrain stated she filed an insurance claim in 1980 and again in April, 1988 and December, 1983. However, the only time water flooded the house itself from rains was in December, 1983. On the other occasions when she filed claims the water came into the house from wave action as trucks passed in the flooded street. The claim she filed in April, 1983 was for only a few hundred dollars.
The Lorrains testified the house flooded in December, 1983 when water covered the entire bottom floor of the two-story house. Mrs. Lorrain stated the flood insurance claim for the flood was approximately $3,000.00. It is undisputed that the December, 1983 house flooding was revealed to the Delcambres. That incident was noted in the purchase agreement. However, the events Mrs. Lor-rain characterized as “nonflooding” were not reported to the Delcambres. Mrs. Lorrain explained she did not consider these occurrences as flooding since water only came into the house as trucks passed by in the flooded street.
Mrs. Lorrain’s testimony characterizing the 1980 and April, 1983 events was corroborated by Mclnnis. She was the listing realtor representing the Lorrains. She was a friend of the Lorrains and had visited the house often. She knew of two occasions when water barely came into the house because of cars driving by in the flooded street. At those times the water was not enough to flood the house; it was barely inside the front door. Mclnnis was aware of only one flood when one-inch of water came into the house from the weep holes. This was the flood which was disclosed.
Mrs. Lorrain testified the price of the house was reduced because of the one flood. Mclnnis stated the house price had been reduced because of the flood and the busy street.
Jerome Wool, an engineer for Jefferson Parish involved with the operation and maintenance of the Parish flood pumps, testified that the storm in April 1980 was a “100 year storm.” In 1980 the pumps had one-third the capacity they do today. In December, 1983 there was flooding due to rain and a freeze. There was not enough water supply available to the pumping stations for cooling hand lubrication pump bearing and gear boxes. That situation would not exist today because of changes in the system.
Mr. Deleambre testified that six months after they purchased the house it flooded. This occurred in November, 1989 and caused approximated $18,000.00 in damage. He stated there were five to six inches of water on one side of the house; the other side was dry. Since that date they have not had any water in the house. However, the property is susceptible to yard flooding.
Wool testified that in November, 1989 there was flooding in that area. The storm causing the flooding was “well beyond the ‘100 year storm’.” Over 12 inches of rain fell at one station and over nine inches fell at another. In addition, one station was shut down for one-half hour since a small child fell into the canal. This caused the canals to rise considerably. Since November, 1989 there have been no major problems with houses being inundated.
STREET AND YARD FLOODING
It is undisputed the property itself was susceptible to yard and street flooding. The Lorrains testified Mr. Lorrain explained street and yard flooding problems to the Delcambres. Mrs. Lorrain testified her husband told the Delcambres that before the parish made improvements in the drainage system water would come into her flower beds with one or two inches of rain. The flower beds are close to the door. She stated that after the improvement there was no water in the flower beds.
Mr. Lorrain testified drainage improvements were made between 1983 and 1989. After the improvements he no longer had yard flooding. From the date of the im- *838 proveniente in 1983 water did not get over the curb. His testimony was uncontroverted. It was also supported by Wool’s testimony.
Wool explained there have been drainage improvements in the area where the house is located. He stated this area’s propensity for flooding was considerably less than in 1980 and 1983. He stated that street flooding and yard flooding is “probably common throughout the Parish.” He would be more concerned with house flooding. The Delcambres testified that prior to the purchase of this house they had resided at another location in the Parish.
His testimony of improved drainage was also supported by that of Silas Cunningham. Cunningham, a civil engineer, testified he designed and implemented drainage improvements for the location in question. His intent was to design drainage for a 10-year rain or storm. He thought these drainage improvements would lessen this property’s susceptibility to flooding.
UMr. Delcambre denied he had been told prior to buying the house that there was a propensity for street flooding. However, Mrs. Delcambre admitted Mr. Lorrain discussed drainage problems. Mrs. Delcambre denied the discussion concerned susceptibility to flooding. She stated she did not understand Mr. Lorrain to be talking about street flooding.
Her statement is contradicted by the testimony of the Lorrains and that of Jamie Ragusa. Ragusa, the Delcambres realtor, testified she was present with the Delcam-bres when Mr. Lorrain discussed his work in getting the parish to get additional drainage “to alleviate some of the flooding in that corner.” She explained street flooding was discussed and there may have been discussion about water sitting in the yard. Ragusa admitted she and the Delcambres had notice of street flooding on that street. She understood there had been more than one occasion of water in that street.
LEAN
The Delcambres knew the house leaned prior to the sale. Mr. Lorrain stated he informed the Delcambres he noticed the house was not level when it flooded in 1983. Although the Delcambres deny they were informed of the lean by the Lorrains; nevertheless, they were aware of it through simple inspection.
Mr. Delcambre testified that prior to the sale his wife was informed by the lender, Fidelity Homestead, that there was a lean and that a door did not work properly. Fidelity’s inspector, C. Earl Colomb, also told him there was a lean. Mr. Delcambre was also told there were hairline cracks.
Before the sale Mr. Delcambre hired Andrew Polmer to inspect the house. He, Ra-gusa, and Polmer stood on the median viewing the house for 10 to 15 minutes. He saw the lean. Polmer advised him the lean was minor and that he should buy the house. Ragusa and Polmer told him he could get a structural engineer to check it out. He decided not to do so.
Polmer’s deposition was introduced into evidence. Before the sale he was contacted by Mr. Delcambre. Polmer was informed of hairline cracks and a lean to the left. He found no significant structural defects. He did notice the lean and door which did not function properly.
Mr. Delcambre testified that knowing there was settlement on the left side of the house he decided to buy the house because he was advised this was normal. He thought the lean which was currently present was the same as that which was noted before he purchased the house.
Mr. Delcambre testified they bought the house when Polmer, Colomb, and the appraiser’s report stated they did not think they should not buy the house.
IsC. Earl Colomb, a realtor and builder, testified he inspected the house for Fidelity Homestead prior to the sale. He saw a couple of “slight cracks” but did not think those were of concern. He found only slight subsidence.
Ragusa testified she stood on the median with Mr. Delcambre and Polmer looking at the house. She saw the lean. Polmer did not feel the lean was that severe and Fidelity was still going to lend the money. She asked the Delcambres if they wanted a report from a structural engineer. They did not do so.
*839 William A. Springer, an expert building engineer and building inspector, testified he did an inspection October 4, 1991 for the Delcambres. This was after the purchase. Springer found differential settlement of 6.8 inches. He noted the house as a unit had settled 6.8 inches. He also noted most of the doors swung downward toward the low level of the slab. At the present time the house was holding together well but any further settlement could cause cracking. He saw no signs of settlement cracking of building materials.
After he had been in the house approximately a year he hired Michael A. Carter, an engineer and contractor to inspect the house. Carter testified he found the house to be out of level approximately seven inches. Neither the slab nor the veneer was cracked. Both the doors and windows were operable. He reached the conclusion the house had probably been constructed out of level. He believed this to be case since there were no serious cracks in the building materials. He felt it structurally safe to live in. He did recommend it be leveled “as far as living condition.” However, he stated that shoring the house would probably create more problems and very possibly more damage.
Mr. Delcambre testified Michael Patrick Dunne told him about a lean and some hairline cracks before the sale. He stated Dunne from Fidelity told Fidelity who in turn told his wife there was a lean on the second floor and a door under the stairs would not stay open. This was the first time he was told of a lean. Mrs. Delcambre admitted she was aware of the lean in the house before she bought the house through the appraisal by Mr. Dunne. She was upset and alarmed.
Michael Patrick Dunne testified as follows. He is a real estate appraiser. He appraised the property for Fidelity prior to sale. When he inspected it, he noted that some inside doors appeared to swing. He also noted a slight lean to the left in the first and second floors and also minor hairline exterior brick and mortar cracks. He noted these factors in his report which he sent to Fidelity.
|6He also noted the cause of those conditions was unknown to him and may be only cosmetic. He noted in his report there was area soil subsidence and foundation settlement. He was not aware there was a 6.9 inch slope. He was aware the property had flooded once.
He stated that if the property had a history of yard flooding with ordinary rain this would probably not adversely affect the value. This, however, would have been noted on his appraisal. He would be more concerned about house flooding.
When he did the appraisal he had a general knowledge of street flooding in the area. He used comparable property in the area which had sold in order to determine this house’s value.
At the time he appraised the house, he appraised it for $95,000.00. His appraisal was introduced into evidence. Two figures are given for an appraisal. The “value by cost” appraisal is $107,000.00 and the “sales comparison” appraisal is $95,000.00.
LEGAL ANALYSIS
Appellants contend a construction defect consisting of a 6.8 inch slope was a hidden defect unknown to either the sellers or the purchasers at the time of sale. Furthermore, they contend only an expert could determine the true nature of this defect.
They cite the case of Glynn v. Delcuze, 149 So.2d 667 (La.App. 4th Cir.1963), in support of their argument they did not know the true nature of the lean prior to sale. In Glynn, the purchaser was aware of broken shingles on the roof but failed to inspect for leaks. In that case a simple inspection would not have revealed the true nature of the improperly constructed roof.
That case is distinguishable. In the instant case appellants knew the house leaned. They hired their own real estate inspector, Polmer, prior to the sale who informed them the lean was minor. Polmer also informed them if they had doubts they could consult a structural engineer.
After the sale the appellants did consult Springer, an engineer and building inspector, who informed them the house had a slope of 6.8 inches on one side. He testified, howev *840 er, there were no structural problems with the house.
We find our case of Fricano v. Bennick, 93-1040 (La.App. 5th Cir. 5/11/94); 638 So.2d 268, writ denied, 94-1517 (La.9/23/94); 642 So.2d 1297 to be controlling. In Fricano a purchaser had notice of a settlement problem when she observed a crack in the hallway and was informed it was settlement. In the present case the appellants were fully aware the house leaned and that some doors did not operate properly. It was these concerns, noted by the Fidelity appraiser, prior to sale, which ^prompted the Delcambres to hire their own building inspector, Polmer. In Fricano we followed Sievert v. Henderson, 506 So.2d 743 (La.App. 1st Cir.1987) which held at 745 [quoting Pursell v. Kelly, 244 La. 323, 152 So.2d 36, 41 (1963) ]:
The proper test to be applied in cases of this kind is whether a reasonably prudent buyer acting under similar circumstances would have discovered the differential settlement problem prior to the act of sale. See Pursell, 152 So.2d at 41. We find that plaintiffs’ observations of the cracks, along with Mrs. Henderson’s declaration as to the settling of all houses that age, should have put plaintiffs on notice that a problem may exist with the house. The settling was evidenced by the cracks and failure of the doors to close properly. It therefore became plaintiffs’ duty to make further investigation. When the defect complained of is partially apparent, the buyer who, nevertheless, purchases the thing without further investigation must be held to have waived his right to sue in quanti minoris. Pursell, 152 So.2d at 41.
Accord, Fruge’ v. Hancock, 94-730 (La.App. 3rd Cir. 12/7/94); 647 So.2d 488, writ denied, 95-0070 (La. 3/10/95); 650 So.2d 1181.
In Fricano the purchasers sought to rescind the sale or alternatively to seek a reduction in the purchase price. We found manifest error in the trial judge’s award of damages to the purchasers.
In the instant case the trial judge correctly determined that Mr. Delcambre testified the lean was no different at the present time from the time of the purchase. He also correctly determined the Delcambres were aware of the lean before the sale. These are factual determinations which will not be disturbed on appeal absent manifest error. Fricano, supra; Cory v. Carona, 527 So.2d 495 (La.App. 5th Cir.1988), writ denied, 532 So.2d 769 (La.1988).
We note that in Cory, however, a purchaser did not notice a slope before the sale. The purchasers did not notice that doors swung open before the sale. The only thing noticed before sale were hairline cracks in the floor tile. Furthermore, two real estate agents and the appraiser did not notice anything in the house raising the question of its integrity. After the sale two engineers examined the house and found structural problems. For example, there was a one-inch gap between the attic beams.
In contrast, the appellants’ expert testified there was no structural problem with the house.
The appellants contend Mr. Lorrain did not disclose the lean. However Mr. Lorrain did testify he informed the Delcambres that when the house flooded the water in the house was not level but was deepest in the living room. Nevertheless, the uneven level of the house was readily discovered by the purchasers prior to the sale.
IgThe lean was apparent. Its extent was “partially apparent.” The Delcambres chose to purchase the house without further investigation. They waived any action in damages for redhibition. Sievert, supra; Fricano, supra; Fruge’, supra.
We note the trial judge misspoke when he opined the Delcambres had negotiated a lower price and thus could not bring an action in redhibition. The record is devoid of evidence of any negotiation between the sellers and the purchasers. However, the absence of negotiation is irrelevant since the Delcam-bres waived any action for damages regarding the lean. Fricano, supra.
Appellants also argue the trial judge erred in failing to consider their other theories of recovery: namely, fraud, negligent misrepresentation, and error. We find no manifest error here as well.
*841 Although the trial judge did not specifically address the argument on these grounds he evidently concluded these lacked merit when he stated, “The Court found the defendants to be credible witnesses.” The inference is that the Lorrains did not engage in fraudulent acts nor negligent misrepresentation. That implied finding is supported by the record. The doors which worked improperly were not concealed from the Delcambres. The incidents of street and yard flooding were also revealed. Mr. Lorrain testified he had had no problems with street flooding since the Parish made drainage improvements beginning in 1983 and continuing into 1989. From the date of the improvements in 1983 water did not get over the curb. His testimony was uncontroverted. It is also supported by the testimony of Jerome Wool, an engineer for the Parish involved with the operation and maintenance of the Parish flood pumps.
Wool testified the December, 1983 flood reported to the Delcambres by the Lorrains was due to rain and a freeze. There was not enough water supply available to the pumping stations for cooling and lubricating pump bearing and gear boxes. That situation would not exist today because of changes in the system. He explained there have been drainage improvements in that area. He stated that this area’s propensity for flooding was definitely considerably less today than in 1980, 1983, and 1989.
We also find no error in the trial judge’s failure to mention appellants’ alternative theories of recovery. As stated in Hendrix v. Hendrix, 457 So.2d 815 (La.App. 1st Cir.1984) 457 So.2d at 818:
Silence in a judgment as to any part of a demand made in a litigation is construed as a rejection of that part of the claim. Succession of Kelly v. Schauff, 323 So.2d 243 (La.App. 1st Cir.1975).
19Accord, Mabry v. Mabry, 522 So.2d 699 (La.App. 5th Cir.1988).
Appellants also assert the mutual mistake by both parties as to the extent of the lean should vitiate the contract. However, the Louisiana Supreme Court in Scott v. Bank of Coushatta, 512 So.2d 356 (La.1987), has reaffirmed its prior holding in Wikoff v. Townsend, 7 Mart, (o.s.) 451 (La.1820). In Wikoff the defendants purchased a lot which they erroneously believed was a 200-foot lot. Likewise, the plaintiffs agreed to a purchase of a 200-foot lot. The lot, however, did not equal this measurement. The Scott court noted at 363:
Focusing on the buyer’s shortcomings in failing to measure the lot, our predecessors refused to grant rescission:
We do not think that this is an error which vitiates the contract. The defendants understood they were purchasing a space of two hundred feet in front; they knew, or at least must be supposed to have known, what extent that was. If they wanted to satisfy themselves on that score, they might have had it measured; but, if relying on their own judgment they made any mistake, as to the real extent of the two hundred feet, they cannot plead such a mistake as an excuse.
7 Mart. (O.S.) at 452-53.
Accord, Smith v. Remodeling Service, Inc., 9-L-589 (La.App. 5th Cir. 12/14/94); 648 So.2d 995.
This case is similar to Wikoff since it was only after the property was measured that the Delcambres and the Lorrains knew the slope was 6.8 inches. The Delcambres knew there was a slope and problems with the doors. If dissatisfied they could have it measured. Polmer informed them if they doubted his opinion it was minor they could call a structural engineer. They chose not to do so.
The case of Tauzier v. Lewis, 562 So.2d 924 (La.App. 5th Cir.1990), relied on by appellants, is distinguishable. In that case the offer was contingent on a survey reflecting a set measurement. It provided for a reduction in price accordingly. Only the buyers knew of the discrepancy.
Regarding the history of drainage problems Mr. Lorrain openly discussed the problems he had had with street and yard flooding and his efforts to have the drainage improved. Since the Delcambres were aware of the proneness for street flooding in *842 the past this problem was not a hidden defect and therefore not redhibitory. La.Civ.Code art. 2521.
_|u>In addition to the proneness of the property to flood the appellants contend the house flooding they experienced several months after moving in was a redhibitory defect. The trial judge correctly concluded this was not the case since this was extraordinary rainfall. He correctly cited Smith v. Kennedy, 392 So.2d 177 (La.App. 2nd Cir. 1980). The Smith court explained at 178, “Whether a residence is susceptible of flooding will be determined by the peculiar circumstances of each case and not solely by the fact of flooding.”
In Rabai v. First National Bank of Gonzales, 492 So.2d 90 (La.App. 1st Cir.1986), writ denied, 496 So.2d 354 (La.1986), the court held at 92:
The trial court applied the proper law in stating that flooding under extraordinary conditions does not form the basis for an action in redhibition or in quanti minoris. Braydon v. Melancon, 462 So.2d 262 (La. App. 1st Cir.1984).
Furthermore, there is no evidence this house flooded under normal conditions as in Brannon v. Boe, 569 So.2d 1086 (La.App. 3rd Cir.1990). Additionally, the Lorrains did not conceal that the property was flood prone as in Prieur v. Lambert, 534 So.2d 987 (La.App. 5th Cir.1988), writ denied, 536 So.2d 1242 (La.1989).
While the Lorrains did not reveal the 1980 flood, this flood was an extraordinary one as testified to by Wool, who stated it was a 100-year flood. The Lorrains had no duty to declare that flooding as a redhibitory defect. Smith, supra.
Accordingly, for the reasons stated, the judgment is affirmed at appellants’ cost.
AFFIRMED.