Gonzalo **DIAZ VICENTE**, et al., Plaintiffs,

v.

Davison **OBENAUER** and S. Davison Obenauer, Defendants.

Civ. A. No. 89–0520–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 25, 1990.

---

John Thorpe Richards, Jr. and Andrew N. Petrakes, Dunnells Duvall Bennett & Porter, Washington, D.C., for plaintiffs.

Jonathan C. Thacher and Todd D. Bunn, Thacher, Swiger & Day, Fairfax, Va., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLIS, District Judge.

This matter came before the Court on October 18 and 19, 1989 for a bench trial on the merits. Pursuant to a post-trial briefing schedule, the parties submitted Proposed Findings of Fact and Conclusions of Law. The matter is now ripe for disposition and the Court sets forth here its Findings of Fact and Conclusions of Law, pursuant to Rule 52(a), Fed.R.Civ.P.

### Jurisdiction and Venue

The Court, pursuant to 28 U.S.C. § 1331 has subject matter jurisdiction over Count 14 of the Second Amended Complaint ("Complaint") as that claim arises under the laws of the United States. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 204.10b–5.

Jurisdiction exists over the remaining state claims (Counts 1–13, 15–21) by virtue of the doctrine of pendent jurisdiction. *See United ed Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The Court also has jurisdiction over the subject matter of the state claims pursuant to 28 U.S.C. § 1332(a), as the parties are of diverse citizenship and the amount in controversy exceeds the sum of ten thousand (10,000) dollars exclusive of interest and costs.[1]

Venue is proper in this Court under 28 U.S.C. § 1391(c) because the claims arose in the Eastern District of Virginia.

### Parties

Defendant Davison Obenauer is a citizen of California. During the period of time relevant to the causes of action alleged in the Complaint, Davison Obenauer resided and conducted business in the Commonwealth of Virginia. S. Davison Obenauer is the son of Davison Obenauer and a citizen of Virginia. He currently resides in Burke, Virginia.

Plaintiffs Gonzalo Diaz Vicente ("Gonzalo Diaz"), Gloria M. De Diaz, Alberto Mondria, Jorge Simon, Gonzalo Diaz Mondria, Salvador Diaz, Manuel Vidal, Luis Diaz, Francisco Mondria, Hermelinda V. De Mondria, Margarita Reynoso, Begona Suarez, Esteban Alvarez, Ma. Luisa Ruiz De Alvarez, Jose Antonio Diaz, Alejandro Ogarrio, and Maria Luisa Vicente de Diaz[2], are citizens and residents of Mexico.

### Overview and Proceedings to Date

This multi-count breach of contract, fraud and securities fraud action grows out of plaintiffs' investments in a real estate development project in Chesapeake, Virginia, known as Las Gaviotas–Shangri La ("Las Gaviotas"). Davison Obenauer and his immediate family, including his son, S. Davison Obenauer, managed the development of Las Gaviotas through the Virginia

---

1. This action was commenced prior to the effective date of the amendment to Section 1332(a) increasing the jurisdictional amount to $50,000 exclusive of interest and costs. *See* 28 U.S.C. § 1332(a) (1989).

2. Defendant Maria Luisa Vicente de Diaz is the administrator of the estate of her late husband, Salvador Diaz Du–Pond.

International Development Corporation ("VIDCO") a Virginia corporation they owned and controlled.

Plaintiffs in this action seek to recover money loaned or invested in connection with Las Gaviotas on three distinct occasions. First, recovery is sought for $600,000 plaintiffs collectively invested in Las Gaviotas between October 1983 and January 1984 (Counts 1–16, 21). This amount was invested through twelve "Participation Agreements" by which different groups of plaintiffs acquired twelve $50,000 participation interests in Las Gaviotas. Significantly, each Participation Agreement provided (i) that the money invested would be used by VIDCO solely for expenses relating to the development of Las Gaviotas; (ii) that the money invested would be returned to plaintiffs from the proceeds of the project within two and one-half years from the investment date; and (iii) that after repayment of the principal amount invested, plaintiffs would receive additional distributions of the project's net proceeds on a pro-rata basis such that each participant would realize an annualized 35% return on her or his investment. Plaintiffs allege that defendants breached all the Agreements. Thus, each of the Counts Nos. 1 through 12 of the Second Amended Complaint alleges a breach by both defendants of a specific Participation Agreement, with damages of $50,000 plus interest sought on each of the twelve contracts. Count 13 alleges multiple breaches of fiduciary duty by Davison Obenauer and seeks recovery from him of the $600,000 cumulative investment on behalf of all plaintiffs. Counts 14 through 16 also focus on the $600,000 cumulative investment and are based on allegations of fraud under state and federal law by both defendants. Thus, Count 14 asserts a federal 10b–5 securities fraud claim against both defendants and seeks $1,000,000 in punitive damages, as well as $600,000 in compensatory damages. Count 16 seeks the same damages against defendants based on common law fraud. And Count 15 alleges defendants violated Virginia's securities laws, specifically Virginia Code § 13.1–522, and seeks $600,000 plus interest and attorneys fees.

The second transaction covered in the Complaint concerns the August 1987 $350,000 loan made by Gonzalo Diaz and his late father to VIDCO in connection with the Las Gaviotas project. Davison Obenauer promised to repay this amount plus interest in three months. The Complaint alleges that repayment never occurred. Accordingly, Count 17 alleges breach of contract on behalf of Gonzalo Diaz and the administrator of his father's estate, Maria Luisa Vicente de Diaz, and seeks damages of $350,000 plus interest against both defendants. Count 19 also concerns the $350,000 loan and alleges fraud against Davison Obenauer. This count seeks $200,000 in compensatory damages and $1,000,000 in punitive damages on behalf of Gonzalo Diaz and $150,000 in compensatory damages and $1,000,000 in punitive damages on behalf of the administrator, Maria Luisa Vicente de Diaz.

The third and final transaction covered in the Complaint is a $100,000 loan made by Gonzalo Diaz to Davison Obenauer in January 1988. Plaintiffs allege this loan was also not repaid. Accordingly, Count 18 alleges breach of contract against Davison Obenauer and seeks recovery of the $100,000 loan, and an additional $2,500 contemporaneously loaned to Davison Obenauer, plus interest. And Count 20 alleges fraud against Davison Obenauer growing out of this transaction and seeks $100,000 in compensatory damages and $1,000,000 in punitive damages.

In sum, the Complaint includes 21 counts. Many were disposed of prior to trial by way of summary judgment or default. Davison Obenauer deliberately defaulted and never filed an answer. As a consequence of this default, the Court, on August 3, 1989, entered judgment against Davison Obenauer with respect to each breach of contract claim (Counts 1–12, 17) and awarded plaintiffs total damages of $600,000 plus interest. *Gonzalo Diaz Vicente v. Davison Obenauer, et al.*, Civil Action No. 89–0520–A (unpublished order). As a result of the default, the Court also entered judgment against Davison Obenauer on the remaining claims for fraud,

breach of contract, and breach of fiduciary duties (Counts 13–16, 20), but reserved the question of damages for the trial on the merits.[3] Final judgment, pursuant to Rule 54(b), Fed.R.Civ.P., was entered on October 20, 1989.

Defendant S. Davison Obenauer appeared and filed an answer generally denying liability and specifically denying any role in the alleged fraudulent conduct. On August 3, 1989, the Court granted Summary Judgment for plaintiffs against S. Davison Obenauer on each of the breach of contract claims asserted against him (Counts 1–12, 17). As a result of this Summary Judgment, the Court awarded contract damages against S. Davison Obenauer in the total amount of $950,000 plus interest. This amount represents the $600,000 due under the twelve Participation Agreements, added to the $350,000 due from the defaulted 1987 loan. At the time of trial, therefore, the following claims and issues remained for adjudication:

| S. DAVISON OBENAUER<br>(Liability & Damages) | DAVISON OBENAUER<br>(Damages only) |
|---|---|
| | Count 13<br>(breach of fiduciary duty)<br>(compensatory damages $600,000) |
| Count 14<br>(fed. securities fraud (10b–5))<br>(compensatory damages $600,000)<br>(punitive damages $1,000,000) | Count 14<br>(fed. securities fraud (10b–5))<br>(compensatory damages $600,000)<br>(punitive damages $1,000,000) |
| Count 15<br>(Va. securities fraud)<br>(compensatory damages $600,000) | Count 15<br>(Va. securities fraud)<br>(compensatory damages $600,000) |
| Count 16<br>(common law fraud)<br>(compensatory damages $600,000)<br>(punitive damages $1,000,000) | Count 16<br>(common law fraud)<br>(compensatory damages $600,000)<br>(punitive damages $1,000,000) |
| Count 19<br>(common law fraud)<br>(compensatory damages $350,000)<br>(punitive damages $1,000,000) | Count 19<br>(common law fraud)<br>(compensatory damages $350,000)<br>(punitive damages $1,000,000) |
| | Count 20<br>(common law fraud)<br>(compensatory damages $102,500)<br>(punitive damages $1,000,000) |
| Count 21<br>(breach of fiduciary duty)<br>(compensatory damages $600,000)<br>(punitive damages $1,000,000) | |

---

The bench trial in this matter consumed two days, involved the testimony of six witnesses and the admission into the record

**3.** Although the Court's August 3, 1989 Order is somewhat ambiguous, stating that "judgment should be entered on all the plaintiffs' claims for breach of contract and that the question of damages on the remaining counts should be reserved for trial," the record makes clear that Davison Obenauer indeed defaulted on all counts and the Court intended to enter judgment accordingly and implicitly did so.

of eighty-two exhibits. The bulk of the testimony focused on S. Davison Obenauer's role in the acts and events alleged to constitute fraud, securities fraud and breach of fiduciary duty. In essence, S. Davison Obenauer denies complicity in the acts or events, contending that he was a VIDCO officer and director in name only and that any role he played was merely that of a college-age son dutifully following the directives of his father.

## FINDINGS OF FACT

### A. *Investments under Participation Agreements*

In October 1983, Davison Obenauer.was seeking $2,000,000 in venture capital for use by VIDCO in acquiring, developing and selling the Las Gaviotas project in Chesapeake, Virginia. In this connection, Davison Obenauer successfully solicited investments in VIDCO from various friends and relatives in Mexico[4] by offering them an opportunity to invest in a Las Gaviotas unit. These friends and relatives are the plaintiffs in this matter. To induce the plaintiffs to purchase these particular interests, Davison Obenauer represented (i) that the money invested would be used by VIDCO solely for the development and marketing of the Las Gaviotas project, (ii) that the money would be repaid to plaintiffs from the project's net proceeds within two and one-half years of the investment date, and (iii) that in addition to the repayment of the principal, net proceeds from the project would be made to the plaintiffs on a pro-rata basis so that each plaintiff would receive an annualized thirty-five percent return on her or his investment. Based on these representations, the following twelve groups of plaintiffs invested $50,000 per group:

| Date | Plaintiff Investors | Amount of Investment |
|---|---|---|
| Oct. 1983 (Count 1) | Gonzalo Diaz, Gloria M. De Diaz, Alberto Mondria, and Jorge Simon | $50,000 |
| Oct. 1983 (Count 2) | Gonzalo Diaz, Gloria M. De Diaz, and Gonzalo Diaz Mondria | $50,000 |
| Oct. or Nov. 1983 (Count 3) | Gonzalo Diaz and Salvador Diaz | $50,000 |
| Oct. 1983 (Count 4) | Manuel Vidal (deceased),[5] Luis Diaz, and Salvador Diaz | $50,000 |
| Oct. 1983 (Count 5) | Francisco Mondria, Hermelinda V. De Mondria, and Gloria M. De Diaz | $50,000 |
| Oct. 1983 (Count 6) | Margarita Reynoso and Begona Suarez | $50,000 |
| Oct. 1983 (Count 7) | Maria Luisa Vicente De Diaz, Salvador Diaz Du–Pond, and Gonzalo Diaz | $50,000 |

---

**4.** Davison Obenauer's wife had grown up in Mexico and was related to some of the plaintiffs.

**5.** Manuel Vidal died following the filing of this action and has been replaced as a plaintiff by his executor Ignacio Arcos Valdes.

| Date | Plaintiff Investors | Amount of Investment |
|---|---|---|
| Jan. 1984 (Count 8) | Esteban Alvarez, Ma. Luisa Ruiz De Alvarez, Gonzalo Diaz, and Gloria M. De Diaz | $50,000 |
| Jan. 1984 (Count 9) | Maria Luisa Vicente De Diaz, Salvador Diaz Du–Pond and Gonzalo Diaz | $50,000 |
| Jan. 1984 (Count 10) | Francisco Mondria, Gloria M. De Diaz, and Hermelinda V. De Mondria | $50,000 |
| Jan. 1984 (Count 11) | Gloria M. De Diaz, Gonzalo Diaz, Jose Antonio Diaz, and Alejandro Ogarrio | $50,000 |
| Jan. 1984 (Count 12) | Gonzalo Diaz, Gonzalo Diaz Mondria, and Gloria M. De Diaz | $50,000 |

Thus, between October 1983 and January 1984 plaintiffs invested $600,000 in VIDCO pursuant to twelve Participation Agreements. The principal amount of these loans was never repaid, nor did any plaintiff receive any additional distributions toward the promised annualized thirty-five percent return. Moreover, as described herein in greater detail, contrary to representations made to plaintiffs, expenditures of the money plaintiffs invested in VIDCO was not limited to activities directly connected with the development and marketing of the Las Gaviotas project.

### B. *The $350,000 and $100,000 Loans*

In July 1986, Davison Obenauer, indicating that additional funds were needed for Las Gaviotas, solicited a $350,000 loan from Gonzalo Diaz and his now-deceased father. On the terms of this loan, the money was to be paid in three months with interest at fifteen percent per annum. Gonzalo Diaz and his father agreed to this loan and accordingly loaned $350,000 to VIDCO, with $200,000 coming from Gonzalo Diaz and $150,000 from his father.

In June 1988, Davison Obenauer solicited a personal loan of $100,000 from Gonzalo Diaz, who was then visiting the project in Chesapeake, Virginia. To induce Gonzalo Diaz to make this loan, Davison Obenauer represented to Gonzalo Diaz that the Las Gaviotas project was nearly finished, but that another $100,000 was needed to complete the project. Davison Obenauer also represented that once the project was completed, VIDCO would be able to borrow $5,000,000 to refinance the project and reimburse all plaintiffs. In the course of the exchange, Davison Obenauer also knowingly misrepresented VIDCO's financial condition and concealed substantial outstanding debts owed by the project. In reliance on these false representations, Gonzalo Diaz, on January 13, 1988, loaned Davison Obenauer $100,000 plus an additional $2,500, which sums were to be repaid on or before March 31, 1988. A memorandum dated January 14, 1988, addressed to Gonzalo Diaz and signed by Davison Obenauer, characterizes this transaction as a loan to VIDCO. Gonzalo Diaz has never been repaid the loan, nor any interest due on it. By his default, Davison Obenauer effectively admits that he obtained this $100,000 loan from Gonzalo Diaz through false representations.

### C. *Misappropriation of VIDCO Funds*

From 1983 through 1988, the period of time pertinent to this action, Davison Obenauer was an officer and director of VID-

CO. But more than this, he effectively controlled every aspect of VIDCO's operations. S. Davison Obenauer, his son, also served as an officer and director of VIDCO. His tenure as an officer commenced at least as early as June 1986 and continued until the summer of 1988, when VIDCO was sold to David Gibson. S. Davison Obenauer also served as a director from at least as early as June 1986 until he resigned on March 17, 1988.

Abundant and convincing record evidence confirms that Davison Obenauer and his son, while acting as officers and directors of VIDCO, misappropriated large sums of VIDCO funds for their personal use and expenses. Examples of this misappropriation abound. They include use of VIDCO funds to (i) purchase expensive sports cars and aircraft for personal use, (ii) pay for family vacations, and (iii) cover various personal living expenses including salaries for household servants, and college tuition for S. Davison Obenauer. More specifically, between 1983, when S. Davison Obenauer obtained his driver's license, and 1986, Davison Obenauer used VIDCO funds to buy his son, in fairly rapid succession, two Camaros, a Corvette and finally, a Porsche 944. Davison Obenauer also used VIDCO funds to purchase luxury cars for his own use and for the family's use as well. Insurance for all these vehicles was paid for with VIDCO funds. VIDCO funds were also used to purchase, operate and maintain at least five aircraft, including in ascending order of size, a Beech Baron, a Cessna 421, a Jet Commander 1121, a Jet Westwind and finally, a four-engine jet, all of which were substantially, if not exclusively, used for personal purposes. Indeed, the Cessna 421, although used occasionally for VIDCO business, was based near S. Davison Obenauer's college so that he could use it during his sophomore year to obtain a pilot's license. And VIDCO paid for the aircraft's maintenance and operating expenses in this connection. Among other incidents involving personal use of the aircraft are flights on the Jet Westwind to the Caribbean and Europe for family vacations, flights to Obenauer homes in Boca Raton, Florida and San Diego for school vacations, a flight to Mexico to visit relatives, a flight to Montreal to celebrate a July 4th weekend, and a flight to California for S. Davison Obenauer and his college friends. Not surprisingly, business records reflect that at least $575,423.00 in VIDCO funds were expended in the purchase, operation, maintenance and piloting of the aircraft for the personal use of the Obenauer family.

Nor is this the full measure of the Obenauers' misappropriation of VIDCO funds. In addition to the purchase of automobiles and aircraft for personal use and the financing of family vacations,[6] Davison Obenauer also used VIDCO funds for a wide range of other personal, non-corporate purposes, including (i) the payment of his son's college tuition and living expenses, (ii) the purchase of $350,000 worth of emeralds from Pakistan, which emeralds Obenauer apparently converted to his own use, (iii) the payment of the costs of S. Davison Obenauer's wedding reception and dinner, (iv) the payment of various department store charges (Saks Fifth Avenue, Montgomery Ward and Sears), (v) the payment of rent on a home in Boca Raton, Florida, and (vi) the payment of various personal credit card bills. Between October 1984 and July 1988, at least $182,076.42 in VIDCO checks were used to pay the personal expenses of defendants and their families.

VIDCO's bank records further reflect defendants' misappropriation of the corporation's funds. S. Davison Obenauer was not entitled to any salary or payment from VIDCO other than the $186.00 per week he claims he earned for summer work in 1985. Yet, VIDCO's bank records reflect that between May 1985 and July 1988 S. Davison Obenauer received checks from VIDCO in the amount of $51,275.99. And between December 1986 and January 1988, the records show that an additional $5,000 was transferred directly from VIDCO's bank account to S. Davison Obenauer's account. He also received $8,651 in checks from San

---

6. The most lavish of these vacations was a month-long European jaunt that included stays in Iceland, England, France, Holland and Scotland.

Diego Bay Investments, a corporation owned and controlled by the Obenauers and into which the Obenauers transferred VIDCO funds in the sum of $149,258.38.

For Davison Obenauer, the VIDCO payment amounts are even greater. It appears from VIDCO's bank records that, between November 1984 and July 1988, Davison Obenauer personally received VIDCO checks in the amount of $500,219.71. Beyond this, it appears Davison Obenauer used other, more subtle means to obtain VIDCO's funds. Thus, the trial record reflects that VIDCO cleared $506,715.80 in the sale of a parcel of land to a separate corporate entity controlled by Adrian Bailey, Davison Obenauer's business partner. These funds were transferred to bank accounts controlled by Davison Obenauer, including a personal account and an account of Swan, Inc., another company owned and controlled by the Obenauer family.[7] Davison Obenauer falsely told Bailey that he was taking this money for the purpose of repaying Las Gaviotas investors. Similarly, in August and December 1986 Davison Obenauer took another $704,154.33 from VIDCO, this sum representing the net proceeds from the sales of two other parcels of VIDCO land. Again, he falsely told Bailey that this money would be used to repay Las Gaviotas investors. No part of the $506,715.80 or $704,154.33 was ever used for this purpose.

In summary, the record permits no conclusion but that Davison Obenauer and his son systematically plundered VIDCO assets and misappropriated its funds for their own personal uses and purposes. Perhaps S. Davison Obenauer's testimony summed it up best. He admitted receiving reimbursement for various personal expenses, including airline tickets for personal use, clothing and fuel, and maintenance expenses for his personal use of various aircraft. He was even reimbursed by VIDCO for a $1,260 Christmas gift for his father. When asked whether this payment was un-usual, he responded with this telling comment:

> I've never seen a personal account of his [Davison Obenauer's]. I did not consider it strange to have corporate or company checks written to pay for things I needed to pay for. That's the way it always has been.

So extensive was the Obenauers' pillaging of VIDCO that it did not escape the notice of several credible witnesses. Adrian Bailey, VIDCO's executive vice-president from 1983 to July 1986, testified that Davison Obenauer's consistent practice was to withdraw funds from VIDCO whenever any cash accumulated. According to Bailey, Davison Obenauer often made these withdrawals on the pretext of some emergency. On one occasion, Bailey recalled, Davison Obenauer took between $300,000 and $350,000 of cash from VIDCO for the "emergency purpose" of purchasing a home in Boca Raton, Florida. Bailey further testified that until July 1986, Davison Obenauer had VIDCO pay his personal credit card bills totaling $1,500 to $3,000 per month.[8] Diane Goldstein, an accountant who worked for Davison Obenauer for more than 10 years and performed accounting services for VIDCO confirmed that Davison Obenauer and his son used VIDCO funds for purely personal expenses. Nancy Miller, a certified public accountant, testified that she performed an audit for VIDCO for the year ending February 1987. In the course of this audit, she reported that she recharacterized as dividends the $1,020,627.00 Davison Obenauer took from VIDCO for his personal expenses. This amount does not include the airplane expenses because Davison Obenauer falsely reported to the auditors that these expenses related solely to VIDCO business. Significantly, Davison Obenauer concealed from the auditors the existence of plaintiffs' $600,000 investments in the Participation Agreements. Also concealed was

---

7. S. Davison Obenauer owned 45.5% of the stock of Swan, Inc.

8. In addition to serving as VIDCO's executive vice-president, Bailey also owned 10 percent of VIDCO's stock. He testified that he was power-less to halt Davison Obenauer's misappropriations of VIDCO funds and that disagreements in this regard led to his departure from VIDCO in July 1986.

the additional $350,000 sum plaintiffs had loaned VIDCO subsequent to the Participation Agreements.[9]  Given the Obenauers' systematic misappropriation of VIDCO funds, it is not surprising that the repayment due dates under the Participation Agreements and the $350,000 loan came and passed without any payment on the debts.

### D. *Renegotiation of Debts*

By August 1987, the money owed plaintiffs under the Participation Agreements and the $350,000 loan had not been paid and was past due.  Deeply concerned about this, Gonzalo Diaz, acting as the agent and representative of the other plaintiffs, traveled to Chesapeake, Virginia to take appropriate steps to protect plaintiffs' interests. In this connection, Gonzalo Diaz met with Davison Obenauer to express to him plaintiffs' concern over whether they would be repaid, especially in view of the fact that Davison Obenauer was then suffering from a serious, life threatening illness.  To accommodate plaintiffs' concerns, Davison Obenauer offered to have his son join him in assuming personal responsibility for repayment of all sums due under the Participation Agreements and the $350,000 loan, provided plaintiffs would agree in turn (i) to extend until December 31, 1987 the repayment due date for the principal and interest on the $350,000 loan and the $600,000 investments under the Participation Agreements, and until May 31, 1988 the payment of interest under the Participation Agreements, and (ii) to reduce substantially the Participation Agreements' rate of interest from 35 percent to 18 percent.  Satisfied with this accommodation, Gonzalo Diaz accepted Davison Obenauer's offer and returned to Mexico to await defendants' written confirmation that they would personally guarantee repayment on the agreed upon terms.  On August 31, 1987, Davison Obenauer and his son signed a letter purporting to embody the terms of this latest agreement.  Gonzalo Diaz found this letter

unsatisfactory and demanded a corrected letter.  Davison Obenauer and his son acquiesced and signed such a letter on or about September 22, 1987 and sent it to Gonzalo Diaz.  That letter was signed by Davison Obenauer and his son both in their personal capacities and in their official capacities as officers of VIDCO.  This letter substantially modified the terms of the original Participation Agreements and the $350,000 loan agreement.

The September 22d letter is central to plaintiffs' fraud and securities fraud claims.  Especially illuminating in this regard is S. Davison Obenauer's testimony concerning the letter.  In essence, he stated that when he signed the letter he had no intention of repaying the money or of meeting the obligations and further that he had no idea whether his father or VIDCO would do so.  As he put it, he was not worried about whether the money would ever be repaid.  This cavalier attitude was plainly shared by his father.

It seems clear that Davison Obenauer also had no intention of repaying plaintiffs at the time he executed the September 22d letter or at the time he solicited the $100,000 loan from Gonzalo Diaz.  Convincing evidence of this is that on September 22, 1987, the day on which defendants signed the letter to Gonzalo Diaz guaranteeing the investments and the debt, Davison Obenauer certified to the accounting firm a financial status for VIDCO that concealed the existence of VIDCO's obligations to the plaintiffs.

Additional evidence of defendants' fraud in connection with the September 22d letter is their deliberate concealment of a number of material facts, including defendants' misappropriation of VIDCO funds for personal use and living expenses.  Nor is there any doubt that at the time the September 22d letter was signed, S. Davison Obenauer was fully aware that plaintiffs had provided most of VIDCO's working capital and that he and his father were

---

**9.**  Nancy Miller further testified that Davison Obenauer signed a "management representation letter" containing numerous misrepresentations upon which the auditors relied.  Principal

among these misrepresentations was the statement that all material transactions affecting the financial status of the company had been disclosed.

using VIDCO funds, including this capital, to pay for their personal living expenses, salaries for their household help, gifts to each other, S. Davison Obenauer's college tuition, and more. Indeed, as far back as August 1985, S. Davison Obenauer had occasion to read a "Confidential Memo" authored by Adrian Bailey, dated August 3, 1985. This memo stated that VIDCO was capitalized with plaintiffs' money and that this capital was being misappropriated and misused by defendants. Beyond this, S. Davison Obenauer knew about the misappropriation of funds from his own actions. He had personally written himself VIDCO checks of $17,000 during the two months immediately preceding the September 22d letter. Significantly, he wrote these checks knowing he was not entitled to any payments from VIDCO. Finally, S. Davison Obenauer misused VIDCO funds during this period to pay for his personal expenses including salaries for household help, college tuition and expenses related to various personal use of the aircraft.

There can be no serious doubt that the record contains clear and convincing evidence of fraud by S. Davison Obenauer and his father in connection with the September 22d letter. Both knew that the letter was important to the plaintiffs and that plaintiffs were relying upon the representations and assurances it contained. Indeed, he and his father signed the letter for the specific purpose of inducing plaintiffs' forbearance from taking immediate action to recover their money. Yet, defendants signed the letter without the slightest intention of meeting the obligations it memorialized. It is plain beyond dispute that had S. Davison Obenauer and his father informed plaintiffs of the misappropriation of funds, plaintiffs would never have agreed to the September 22d letter. Instead, they would have taken prompt steps to recover their money from defendants and VIDCO.

### E. *VIDCO's Bankruptcy*

By summer 1988, VIDCO was in serious financial difficulty. At this time, Davison Obenauer transferred all VIDCO's stock to David Gibson, a transaction witnessed by S. Davison Obenauer. No more than six months later, on January 5, 1989, VIDCO filed for bankruptcy under Chapter 11 of the Federal Bankruptcy Code. Pursuant to the bankruptcy proceedings, various parcels of land owned by VIDCO have been sold and more will be sold. But the proceeds of these sales are sufficient to pay only secured creditors, not unsecured creditors, including the plaintiffs. Testimony from David Gibson and S. Davison Obenauer makes clear that VIDCO's financial difficulties were caused by its inability to sell lots encumbered by mechanics' liens. These liens were filed because VIDCO, having been systematically and thoroughly looted by defendants, had insufficient funds to pay its debts.

### CONCLUSIONS OF LAW

Davison Obenauer deliberately defaulted. He filed no answer or responsive pleading. Although he appeared as a witness for his son at trial, he chose not to offer any defense for himself and never contested or sought vacation of the default. Accordingly, Davison Obenauer's liability is established on all counts except, as will be noted, the breach of fiduciary duty count. Further, the Court granted summary judgment as to both defendants on all the contract counts (Counts 1–12, 17)[10]. Thus, these conclusions of law focus chiefly on the following:

(a) *Davison Obenauer:*

(i) damages and liability on the breach of fiduciary duty count

(ii) damages only on the common law fraud and federal and state securities law fraud counts

(b) *S. Davison Obenauer:*

(i) damages and liability as to the common law fraud, federal and state securities fraud, and breach of fiduciary duty counts

---

**10.** By Order dated October 20, 1989, the Court made this ruling a final judgment, pursuant to Rule 54(b), Fed.R.Civ.P.

A. *Common Law Fraud Claims (Counts 16, 19, and 20)*

■ Defendants' fraudulent acts occurred chiefly in Virginia. Accordingly, Virginia law controls plaintiffs' common law fraud claims. *See Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (court must ordinarily apply the choice of law rules of the state in which it sits); *Zaremski v. Keystone Title Ass'n, Inc.*, 884 F.2d 1391 (4th Cir.1989) (unpublished opinion). The rule of *lex loci delicti* is well-settled in Virginia; the place of the injury supplies the governing law in tort actions. *Lachman v. Pennsylvania Greyhound Lines, Inc.*, 160 F.2d 496 (4th Cir.1947) ("it is well settled in Virginia that liability for tort depends upon the law of the place of the injury") (citing *C.I.T. Corp. v. Guy*, 170 Va. 16, 195 S.E. 659 (1938); *Sutton v. Bland*, 166 Va. 132, 184 S.E. 231 (1936)); *Friends of Phil Gramm v. Americans for Phil Gramm*, 587 F.Supp. 769 (E.D.Va.1984).

■ Virginia law recognizes both actual and constructive fraud. *Moore v. Gregory*, 146 Va. 504, 131 S.E. 692 (1925). Constructive fraud is "a breach of legal or equitable duty, which, irrespective of moral guilt ... the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Moore*, 131 S.E. at 697. Thus, constructive fraud does not require scienter or intent to mislead; it can be established whether the representation is innocently or knowingly made. *Chandler v. Satchell*, 160 Va. 160, 168 S.E. 744 (1933); *Mears v. Accomac Banking Co.*, 160 Va. 311, 168 S.E. 740 (1933). In contrast, to prove actual fraud, a plaintiff must show (i) a false representation by defendant, (ii) of a material fact, (iii) made intentionally and knowingly, (iv) with intent to mislead, (v) reliance by the misled party, and (vi) resulting injury to the party misled. *Pennsylvania Life Ins. Co. v. Bumbrey*, 665 F.Supp. 1190, 1200 (E.D.Va.1987); *Saunders v. General Services Corp.*, 659 F.Supp. 1042 (E.D.Va.1986); *Winn v. Aleda Constr. Co.*, 227 Va. 304, 315 S.E.2d 193 (1984). Moreover, a plaintiff may recover for actual fraud by showing reasonable reliance on a promise made by a defendant who had no intention of performing at the moment the promise was made. *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 325 S.E.2d 91, 94 (1985) (when a promisor makes a promise "intending not to perform, his promise is a misrepresentation of *present* fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud") (emphasis in original) (citations omitted).

■ Both constructive and actual fraud are clearly and convincingly proved here with respect to S. Davison Obenauer's execution of the September 22d letter. In that letter, S. Davison Obenauer made representations to plaintiffs that either he or VIDCO would repay the $350,000 loan and the money invested under the Participation Agreements by the dates set forth in the letter. Yet his own testimony establishes that at the time he signed that letter he had no intention of repaying the money or meeting the obligations. Further, he knew that as a result of his and his father's past and ongoing diversion of large amounts of VIDCO funds to their personal use, VIDCO would be unable to repay plaintiffs. Thus, the representations and promises in the letter were knowingly false; they misrepresented S. Davison Obenauer's then existing intention, which was not to make any repayment. As misrepresentations of a present intention to pay, the false statements in the letter are actionable as fraud. *See Colonial Ford*, 325 S.E.2d at 94.

But the fraud of S. Davison Obenauer and his father went beyond the false statements in the letter. Their fraud extended to concealment of material facts. Such concealment is also actionable in Virginia. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 597 (1984). Specifically, the record makes plain that S. Davison Obenauer and his father were misappropriating funds from VIDCO in the months immediately preceding the September 22d letter of assurance to plaintiffs. Defendants deliberately did not disclose this.

The materiality of the Obenauers' misrepresentations and concealments is not

open to doubt. The record evidence amply demonstrates that the Obenauers' fraud in the September 22d letter induced plaintiffs to forbear from taking timely and effective action to recover the money invested with defendants. *Packard Norfolk v. Miller,* 198 Va. 557, 95 S.E.2d 207, 211–12 (1956) ("A fact is material when it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred," quoting 23 Am.Jur., Fraud and Deceit, § 111, at 892). And there can be no question that S. Davison Obenauer concealed from plaintiffs the material fact of the misappropriation of funds.

Abundant record evidence also establishes the third and fourth elements of fraud; namely reliance and injury. That evidence reflects that plaintiffs agreed to extend the time for repayment of their investment and agreed to a reduction of the amount of interest owing on their investments in reliance on S. Davison Obenauer's personal guarantee of repayment. This extension of time permitted S. Davison Obenauer and his father to continue their plundering of VIDCO until it became incapable of repaying any part of plaintiffs' investment. Had defendants not concealed this, plaintiffs would have withheld the additional $350,-000 and pursued remedies to recover their investments while VIDCO still contained the funds to repay them. Defendants' fraud, however, induced the plaintiffs to part with the additional $350,000 and effectively prevented them from taking timely remedial action. In sum, the Court finds that plaintiffs have clearly and convincingly established defendants' fraud in connection with the $350,000 loan. Since the September 22d letter's misrepresentations materially altered the terms of the twelve original Participation Agreements, S. Davison Obenauer's fraud liability extends to these agreements despite the fact that he was not involved in their initial negotiation or formation. And finally, the Court concludes that the same fraud that tainted the $350,000 loan also infected the $102,500 loan. In that connection, however, Davison Obenauer is singly liable, for S. Davison Obenauer was not involved in the transaction.

S. Davison Obenauer argues that plaintiffs' injury is speculative and not the result of defendants' conduct. This contention is plainly incorrect. Testimony at trial by Davison Obenauer established that VIDCO's insolvency resulted from its inability to close on a number of sales contracts due to mechanics' liens placed on VIDCO's property well after defendants' execution of the September 22d letter. It was also established at trial that but for defendants' misappropriation of VIDCO funds, rendering the company unable to meet its lien obligations, VIDCO would not have failed and plaintiffs could have recovered their investments. Since "[f]oregoing alternatives to secure a party's financial position as a result of misrepresentations will support a damage claim grounded in fraud," *Alco Standard Corp. v. Bretner,* 891 F.2d 286 (4th Cir.1989) (unpublished opinion) (citing with approval, *General Motors Acceptance Corp. v. Central Nat'l Bank,* 773 F.2d 771 (7th Cir.1985)), defendants cannot seriously contest that plaintiffs have not established an injury proximately caused by defendants' fraud.

In summary, plaintiffs have shown by clear and convincing evidence that S. Davison Obenauer defrauded plaintiffs both by affirmative, intentional misrepresentations and by deliberate concealment of material facts. Plaintiffs are therefore entitled to compensatory damages in the amounts plaintiffs invested in the Participation Agreements ($600,000) and advanced under the loans ($350,000 and $102,500). As stated above, liability for damages on the $102,500 loan is the sole responsibility of Davison Obenauer.[11]

### B. *Federal Securities Law Claim (Count 14)*

Plaintiffs also assert that S. Davison Obenauer's ratification of the September 22d letter violated the federal securities laws. Specifically, plaintiffs rely on 15 U.S.C. § 78j(b) and 17 C.F.R. § 204.10b–5

---

**11.** The issue of punitive damages is discussed in Part E, *supra.*

("Rule 10b–5") of the Rules and Regulations of the Securities and Exchange Commission ("SEC"). Section 78j(b) makes it illegal to use any deceptive device in connection with the sale or purchase of securities in contravention of the SEC's rules and regulations. Rule 10b–5 proscribes "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the sale or purchase of securities.

◼ As a threshold matter, success on this claim requires that plaintiffs prove that the purchased participation interests and the September 22d letter are "securities" within the meaning of these sections. The term "securities" includes a "certificate of interest or participation in any profit sharing agreement," as well as an "investment contract," which is defined as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *United States Sec. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 297–299, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). Precisely this occurred here. Plaintiffs invested their money pursuant to the Participation Agreements with the expectation of profiting from the Obenauers' development of Las Gaviotas.[12] The Agreements, therefore, fit squarely within the settled definition of "securities" under Rule 10b–5.

◼ The September 22d letter fits equally well within the definition. It modifies the terms of the Participation Agreements and includes a guarantee of the obligations of the Agreements. As such, it is plainly a security subject to Rule 10b–5. The Securities Act's plain language and settled Fourth Circuit authority confirm this result. The Act expressly provides that the term "security" includes not only "participation[s] in any profit sharing agreement" and other "investment contract[s]," but also any "guarantee of" any such investments. 15 U.S.C. § 77b(1). *See also*, Va. Code § 13.1–501.A (" 'Security' means any note; stock ... or participation in any profit-sharing agreement ... or any *guarantee of* ... any of the foregoing." (emphasis supplied)). And, as Judge Butzner wrote in *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1128 (4th Cir.), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974):

> The definition of a security expressly includes a guarantee of any of the other devices enumerated in Section 2(1).... Therefore, a guarantee cannot have the effect of denying coverage to an instrument that otherwise satisfies the Act's definition of security. Whether the guarantee is a part of the production payment or collateral to it is immaterial. *In either event the entire transaction, including the guarantee, falls within the statutory definition of security.*

(emphasis supplied) (footnote omitted). Thus, from this Court's holding that the original Participation Agreements are "securities," it follows that the September 22d letter guaranteeing the original security is also a security for purposes of Rule 10b–5.

But the guarantee is not the only aspect of the September 22d letter that mandates its classification as a security. Equally important in this respect is the letter's modification of the original investment's interest rate and payment deadlines. Abundant authority classifies documents containing these and similar types of modifications as "securities" themselves. *See, eg., Smith v. Cooper/T Smith Corp.*, 846 F.2d 325, 327 (5th Cir.), *reh'g*, 850 F.2d 1086 (1988) (modification in terms and price of stock purchase agreement is "in connection with" the purchase or sale of securities); *Keys v. Wolfe*, 709 F.2d 413, 417 (5th Cir.1983) (modification constitutes a sale where there has been a voluntary amendment to an existing security that effects a significant change in the nature of the investment or in the investment risk such that it is essentially a new investment); *Ahern v. Gaussoin*, 611 F.Supp. 1465,

---

12. Judgment has already been entered against Davison Obenauer on this count. S. Davison Obenauer's liability is predicated, again, on his modification and guarantee of the existing Participation Agreements, not on any involvement in their initial solicitation or investment.

1478–79 (D.Ore.1985) (exchange of one set of notes for another type of note with different terms and interest rate is a sale of a security). The rule that such modifications are themselves securities rests on the sensible notion that a material modification of a security reflects a new investment agreement. Here, too, the September 22d letter materially modified the terms of the existing security and, as such, required plaintiffs to make a new investment decision, namely to continue their investment in defendants' project for a substantial period of time beyond that called for in the original Participation Agreements. Indeed, the September 22d letter was written after the obligation under the Agreements was already past due. This material change of terms embodied in the September 22d letter was plainly an "investment" under Rule 10b–5.[13]

Even putting to one side the risk-varying characteristics of the letter and viewing the letter as a promissory note, this Court's conclusion that the letter is covered by Rule 10b–5 is compelled by the holding in *Reves v. Ernst & Young,* — U.S. —, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). In *Reves,* the Supreme Court adopted the Second Circuit's liberal "family resemblance" test for determining when notes constitute securities for purposes of protection under the federal securities laws. The *Reves* test first presumes that every note is a security. This presumption "may be rebutted only by a showing that the note bears a strong resemblance ... to one of the enumerated categories of instrument [that are not securities]." *Reves,* 110 S.Ct. at 952. The enumerated "non-security" notes are: (i) notes delivered in consumer financing; (ii) notes secured by a mortgage or home; (iii) short term notes secured by a lien on a small business or some of its assets; (iv) notes evidencing a "character loan" to a bank customer; (v) short-term notes secured by accounts receivable; (vi) notes formalizing an open-account debt incurred in the ordinary course of business; and (vii) notes evidencing loans by commercial banks for current operations. *Reves,* 110 S.Ct. at 951. Thus, under the *Reves* analysis, even if the September 22d letter is deemed a mere promissory note, it is presumptively protected by the securities laws unless it resembles one of the categories of notes set forth above. In this case, as in *Reves,* plaintiffs invested in the project

> in order to earn a profit in the form of interest. Indeed, one of the primary inducements offered ... was an interest rate ... above the rate paid by local banks and savings and loans. From both sides, then the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction.

*Reves,* 110 S.Ct. at 952 (footnote omitted). Plaintiffs' investment purpose was distinctly different in character from the investment purposes underlying the categories of non-security notes enumerated by the *Reves* Court. Thus, the September 22d letter's presumptive classification as a security is not rebutted.

Also probative of the letter's status as a security is its own characterization of plaintiffs' contributions to VIDCO as "investments" and the absence of "countervailing factors that would [lead] a reasonable person to question this characterization." *Reves,* 110 S.Ct. at 953. Further, there are no risk-reducing factors to suggest that the letter is not a security. As in *Reves,* the letter is "uncollateralized and uninsured." *Reves,* 110 S.Ct. at 953. Simply put, the letter in no way resembles any of the "non-security" type investments enumerated in *Reves* as beyond the scope of the federal securities laws. In sum, because the September 22d letter was a sale of a security and the evidence at trial clearly and con-

---

**13.** The S.E.C. also views such modifications as sales of securities. *See Allied–Carson Corp.,* [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 80,434 (a company's proposed offer to extend the maturity date of outstanding debentures at a higher interest rate constitutes an "offer to sell" and "sale" of a new security). The S.E.C.'s interpretation of statutes that it administers is, in general, entitled to considerable weight. *See United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1981).

vincingly [14] establishes that S. Davison Obenauer committed fraud in connection with his execution of the letter, plaintiffs have proved their Rule 10b–5 claim and are entitled to judgment on Count 14 of their Second Amended Complaint.[15]

▇ The appropriate measure of damages in a federal securities case under Rule 10b–5 is the difference between the value of the consideration paid and the value of the securities received. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Asso., Inc.,* 496 F.2d 1255, 1264 (4th Cir.1974). In this case, as a result of defendants' misconduct, plaintiffs received nothing—their participation interests are worthless. Thus plaintiffs are entitled to judgment in the amount of $600,000, the full amount invested under the Participation Agreements, plus interest.[16]

C. *State Securities Law Claim (Count 15)*

▇ Section 13.1–522 of the Virginia Securities Act, like the federal securities laws, proscribes the making of fraudulent or misleading statements in connection with the sale or purchase of securities.[17] Unlike its federal counterpart, the Virginia Securities Act does not require scienter. A plaintiff need not establish that the fraudulent representation was made knowingly or with reckless indifference to its truth or falsity; the mere fact of the issuance of the statement is enough. To avoid liability a defendant must "sustain the burden of proof that he did not know, and *in the exercise of reasonable care could not have known, of such untruth or omission."* Va.Code § 13.1–522 (emphasis added).

▇ In this case, S. Davison Obenauer committed actual fraud in connection with his execution of the September 22d letter. *See* Section A above. And, even were this not so, S. Davison Obenauer's admission that he was negligent in failing to discover his father's "abhorrent business practices" and thus failed to exercise the statutorily prescribed "reasonable care," provides an adequate basis for his liability under the Virginia Act. Thus, the conduct element of the claim is clearly satisfied. So, too, is the legal requirement for the fraudulent conduct to occur in connection with a "security." Under Virginia securities law, which is modeled, in part, on the federal securities law, the September 22d letter constituted a sale of a security. *See* Section B above. Accordingly, plaintiffs are entitled to judgment for S. Davison Obenauer's violation of the Virginia Securities Act.

The remedy for violation of Virginia securities law is restitution to plaintiffs of the money invested and interest thereon at an annual rate of six percent (6%), plus reasonable attorneys' fees and costs. *See* Va.Code § 13.1–522. Thus, plaintiffs are entitled to judgment for $600,000 plus 6%

14. Thus, plaintiffs have more than met their burden of proving, by a preponderance of the evidence, that defendants violated the federal securities laws. *See Herman and MacLean v. Huddleston,* 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983) (Rule 10b–5 claim need not be proven by "clear and convincing evidence," but only by a preponderance).

15. Defendants make a meritless argument that the "face-to-face" negotiations that occurred between Gonzalo Diaz and the Obenauers' regarding the content and issuance of the August 31st and September 22d letters deprives plaintiffs of the protection of the securities laws. The single case on which defendant relies, *Behar v. Professional Network Sys., Inc.,* [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 93,155, 1987 WL 6909 (S.D.N.Y. Feb. 10, 1987), is factually and legally inapposite. Face-to-face negotiations do not determine whether a particular transaction is protected by the securities laws. *See, e.g., Baurer v. The Planning Group, Inc.,* 669 F.2d 770, 772–73 (D.C.Cir.1981); *Smith v. Cooper T. Smith Corp.,* 846 F.2d 325, 326 (5th Cir.), *reh'g,* 850 F.2d 1086 (1988).

16. Plaintiffs did not assert a federal securities violation with respect to the $350,000 or $102,500 loans.

17. Virginia law defines a "security" as "any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or *participation in any profit-sharing agreement* ... or ... any guarantee of ... any of the foregoing." Va.Code § 13.1–501.A (emphasis added).

interest, fees and costs.[18]

### D. *Breach of Fiduciary Duty (Counts 13 and 21)*

◼ Plaintiffs also seek to recover damages as a result of defendants' breach of a common law fiduciary duty to plaintiffs. The existence of a fiduciary relationship is a question of fact. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 595 (1984) (citations omitted). Neither the facts of this case, nor the applicable authorities support such a claim.

Apart from showing that some plaintiffs were related to Davison Obenauer's late wife, plaintiffs adduced no facts to show that the parties intended to create a fiduciary relationship. Plaintiffs cite, and the Court has found, no authority that the somewhat attenuated familial relationship is sufficient to convert a typical business investment relationship into one involving the duties of a fiduciary. Instead, plaintiffs' authorities for the existence of a fiduciary relationship in this context are inapposite. *See Allen Realty*, 318 S.E.2d at 595 (a fiduciary relationship is created "when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of one reposing the confidence") (citations omitted); *Hamby v. St. Paul Mercury Indem. Co.*, 217 F.2d 78, 80 (4th Cir.1954) (a fiduciary relationship "arises whenever the property of one person is plac[ed] in [the] charge of another.") Neither decision concerns the creation of a fiduciary relationship in the context of an investment contract. Instead, both involve factual circumstances, such as the pre-existence of an agency or trustee relationship, which typically give rise to fiduciary obligations. To find a fiduciary relationship on the facts of this case would transform garden variety, arm's length invest-

ment transactions into fiduciary relationships. Such a result is neither contemplated, nor dictated by existing law. Accordingly, plaintiffs' claim for breach of fiduciary duty does not succeed.

### E. *Availability of Punitive Damages*

◼ Punitive, or exemplary, damages are damages imposed on a wrongdoer "for the protection of the public, as a punishment to defendant, and as a warning and example to deter him and others from committing like offenses." *Baker v. Marcus*, 201 Va. 905, 114 S.E.2d 617, 620 (1960) (quoting *Zedd v. Jenkins*, 194 Va. 704, 74 S.E.2d 791, 793 (1953)). Plaintiffs seek $1 million in punitive damages in connection with their federal securities claim (Count 14) and their common law fraud claims (Counts 16, 19, 20)[19]. It is well-settled Fourth Circuit law that punitive damages are not available in connection with a claim for damages under Rule 10b–5. *See Carras v. Burns*, 516 F.2d 251, 259 (4th Cir. 1974) ("burden on the securities business from punitive damages is considered to outweigh their contribution to enforcement of securities laws.") (*citing Baumel v. Rosen*, 412 F.2d 571, 576 (4th Cir.1969)). Accordingly, plaintiffs' federal securities claim for punitive damages fails. Virginia common law, however, allows punitive damages "where there is misconduct or malice, or such recklessness or negligence as evinces a conscious disregard of the rights of others," *Baker v. Marcus*, 114 S.E.2d at 621; *see also Strickler v. Neff Trailer Sales, Inc.*, 542 F.2d 890 (4th Cir.), *cert. denied*, 429 U.S. 1024, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976) or "on a showing of willful or wanton conduct which evinces a conscious disregard of the rights of others." *Booth v. Robertson*, 236 Va. 269, 374 S.E.2d 1, 2 (1988), *see also, Jordan v. Sauve*, 219 Va. 448, 247 S.E.2d 739, 742 (1978).[20] In this

---

**18.** Plaintiffs did not assert a state securities violation with respect to the $350,000 or $102,500 loans.

**19.** Plaintiffs also sought $1,000,000 in punitive damages in connection with their breach of fiduciary duty claims. Of course, plaintiffs are not entitled to any punitive damages in that regard as those claims failed.

**20.** The *Carras* case did not reach the issue of whether the federal policy [against punitive damages in connection with Rule 10b–5] should control a district court's decision to try a pendant [sic] claim for punitive damages under state law." *Carras*, 516 F.2d at 260. Plaintiffs have suggested no sound reason why the policies underlying the federal securities laws

case, both defendants participated in fraudulently obtaining and then squandering plaintiffs' money, thereby evincing a total disregard of plaintiffs' rights. Their conduct, the Court has found, was wilful and deliberate. Punitive damages are therefore appropriate for the state common law fraud claims.

It is well-settled in Virginia that "no fixed standard exists for the calculation of punitive damages." *Philip Morris, Inc. v. Emerson*, 235 Va. 380, 368 S.E.2d 268, 287 (1988); *see also, Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 213 Va. 377, 192 S.E.2d 737, 743, *rev'd on other grounds*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). And, although the award of punitive damages is a matter of discretion for the fact finder, *see Worrie v. Boze*, 198 Va. 533, 95 S.E.2d 192 (1957), "[t]he amount of punitive damages awarded should bear some reasonable relationship to the actual damages sustained and to the measure of punishment required." *Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, 747 (citing *Stubbs v. Cowden*, 179 Va. 190, 18 S.E.2d 275, 280 (1942)), *cert. denied sub nom., Fleming v. Moore*, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). Plaintiffs contend that the actual amount of damages they suffered was in excess of $1 million and they assert that a $1 million punitive damage award is justified by defendants' "total lack of remorse over [defendants'] rampant theft of the plaintiffs' money." Although some information regarding defendants' financial positions came out at trial, plaintiffs have offered little specific evidence of defendants' net worth. Because the Court's understanding of defendants' financial condition is limited, it is not well established what would suffice to punish

defendants.[21] The Court's understanding of defendants' financial conditions is limited. First, interrogatory answers show that S. Davison Obenauer earns a salary of approximately $2000 per month. It also appears that he continues to receive significant financial support from his father, including payment of his attorneys' fees in this matter. Although little is known about Davison Obenauer's financial status, well over $1 million worth of assets were diverted to his possession during the commission of the frauds leading to the instant action. In light of these facts, the imposition of $526,250 in punitive damages, representing half the amount of actual damages, appears appropriate. Such an award adequately accommodates the goals of punitive damages and sends a clear message to those who would engage in such fraudulent conduct that the wages of this sin are prohibitively high.

The individual plaintiffs shall each share *pro rata* in the punitive damages award in proportion to their share of actual damages. And, defendants shall each bear joint and several liability for compensatory and punitive damages, except with respect to the $102,500 loan to Davison Obenauer in VIDCO's name. The liability in connection with that loan, made without the involvement of S. Davison Obenauer, rests fully with Davison Obenauer.

## F. *Conclusion*

Although plaintiffs are entitled to damages under various legal theories, they are only entitled to receive one recovery for their single injury. Thus, final judgment on Counts 1–12 and 14–20 will be entered for plaintiffs against defendants in the following amounts, plus interest:

---

should override well-established Virginia law permitting punitive damages, where, as here, intentional and material misrepresentations and concealments cause harm. Because plaintiffs did not seek punitive damages in connection with the state securities claim, the Court has no occasion to decide whether a different result is required in that context.

**21.** It is important to note that plaintiffs' failure to offer detailed financial data about defendants is not fatal to plaintiffs' claim for punitive damages. *See Weatherford v. Birchett*, 158 Va. 741, 164 S.E. 535, 537 (1932) ("evidence of the financial standing of the defendant may be considered" in awarding punitive damages). But such data would doubtless have been helpful in fixing the punitive award.

Judgment Against Davison Obenauer and S. Davison Obenauer

| Plaintiff Investors | Compensatory Damages[22] | Punitive Damages |
|---|---|---|
| Gonzalo Diaz, Gloria M. De Diaz, Alberto Mondria, and Jorge Simon (Counts 1, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Gonzalo Diaz, Gloria M. De Diaz, and Gonzalo Diaz Mondria (Counts 2, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Gonzalo Diaz (Counts 3, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Ignacio Arcos Valdez, and Luis Diaz (Counts 4, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Francisco Mondria, Hermelinda V. De Mondria, and Gloria M. De Diaz (Counts 5, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Margarita Reynoso and Begona Suarez (Counts 6, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Maria Luisa Vicente De Diaz, and Gonzalo Diaz (Counts 7, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Esteban Alvarez, Ma. Luisa Ruiz De Alvarez, Gonzalo Diaz, and Gloria M. De Diaz (Counts 8, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Maria Luisa Vicente De Diaz, and Gonzalo Diaz (Counts 9, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Francisco Mondria, Gloria M. De Diaz, and Hermelinda V. De Mondria (Counts 10, 14, 15, 16) | $ 50,000 | $ 25,000 |

22. The record does not disclose why the breach of contract figures fixed in the August 3, 1989 Order are different from the amounts claimed in the Complaint and stipulation between plaintiffs and S. Davison Obenauer. The figures here are based on the latter. Although plaintiffs are entitled to judgment on more than one theory, they are not entitled to multiple recoveries for a single injury.

Judgment Against Davison Obenauer and S. Davison Obenauer

| Plaintiff Investors | Compensatory Damages | Punitive Damages |
| --- | --- | --- |
| Gloria M. De Diaz, Gonzalo Diaz, Jose Antonio Diaz, and Alejandro Ogarrio (Counts 11, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Gonzalo Diaz, Gonzalo Diaz Mondria, and Gloria M. De Diaz (Counts 12, 14, 15, 16) | $ 50,000 | $ 25,000 |
| Gonzalo Diaz (Counts 17, 19) | $200,000 | $100,000 |
| Maria Luisa Vicente De Diaz (Counts 17, 19) | $150,000 | $ 75,000 |

Judgment Against Davison Obenauer

| | | |
| --- | --- | --- |
| Gonzalo Diaz (Counts 18, 20) | $102,500 | $ 51,250 |